UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------- X

SECURITIES AND EXCHANGE
COMMISSION,

                Plaintiff,

    - against -

COLLINS & AIKMAN
CORPORATION, DAVID A.
STOCKMAN, J. MICHAEL STEPP,
GERALD E. JONES, DAVID R.
COSGROVE, ELKIN B. MCCALLUM,
PAUL C. BARNABA, JOHN G.
GALANTE, CHRISTOPHER M.
WILLIAMS, and THOMAS V.
GOUGHERTY,

                Defendants.

------------------------------------------------- X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 12/2/07

OPINION AND ORDER

07 Civ. 2419 (SAS)

SHIRA A. SCHEINDLIN, U.S.D.J.:

I.     INTRODUCTION

        This action is brought by the Securities and Exchange Commission

("SEC") against the Collins & Aikman Corporation ("C&A" or the "Company")

and David A. Stockman, J. Michael Stepp, David R. Cosgrove, Elkin B.

McCallum, Paul C. Barnaba, John G. Galante, Gerald E. Jones, Christopher M.

Williams, and Thomas V. Gougherty. The Complaint alleges that the defendants

were involved in securities fraud during a period spanning roughly late 2001

through early 2005. C&A has consented to an order of final judgment and is no

longer a party to this action. Defendants Stockman, McCallum, Stepp, Cosgrove,

and Barnaba (the "Individual Defendants") move to dismiss the Complaint. For

the reasons set forth below, their motions are denied.

## II. BACKGROUND[1]

### A. Parties

C&A is a Delaware corporation engaged in the production of

automobile parts.[2] It employs approximately 12,000 workers, and until May 2005

its shares were traded on the New York Stock Exchange.[3]

Stockman is a co-founder and partner of Heartland Industrial Partners

("Heartland"), a private equity firm that acquired a controlling interest in C&A in

2001.[4] Stockman joined C&A's Board of Directors in 2001 and became CEO in

---

[1]     The facts summarized in this Opinion are drawn from the Complaint
and are presumed to be true for the purpose of these motions. This Opinion does
not discuss the claims against those defendants who have not moved to dismiss.

[2]     *See* Complaint ("Compl.") ¶ 10.

[3]     *See id.*

[4]     *See id.* ¶ 11.

-2-

August 2003.[5] Stepp was CFO of C&A from 1995 to 1999 and from January 2002 to October 2004, and served as a consultant to the Company in the interim.[6] He served on the Board from 2001 to 2006.[7] Cosgrove was C&A's Vice President of Finance during part of 2002, Vice President for Financial Planning and Analysis from August 2002 to October 2004, and then Corporate Controller, a position he held through May 2005.[8] McCallum, a significant shareholder of C&A and a member of the Board from September 2001 through May 2004, owns Joan Fabrics, one of C&A's suppliers.[9] Barnaba was Director of Financial Analysis for C&A's Purchasing Department from April 2002 to December 2004, when he became a Vice President and Director of Purchasing for C&A's Plastics Division.[10]

## B.    The Round-Trip Transactions

After Heartland acquired a controlling interest in C&A and Stockman

---

5    *See id.*

6    *See id.* ¶ 12.

7    *See id.*

8    *See id.* ¶ 14.

9    *See id.* ¶ 15.

10   *See id.* ¶ 16.

-3-

became involved in its management, C&A began perpetrating various accounting frauds "designed in part to create the appearance that C&A's financial performance was improving under Stockman's direction."[11] In 2001, C&A solicited a three million dollar loan from McCallum that would be represented for accounting purposes as income (a "round-trip transaction").[12] McCallum transferred the money to C&A in January 2002 and C&A recognized it as a reduction of costs that had the effect of increasing income.[13] Pursuant to their understanding, C&A later transferred $3 million in equipment to McCallum.[14]

In late 2002, C&A further inflated its reported income by purchasing assets from McCallum at a price exceeding their market value in return for "rebates" of the excess.[15] These arrangements were personally negotiated by Stockman, and Stepp assisted in collecting the payments.[16] McCallum provided false documentation that represented some of these payments as rebates on a

---

[11]  *Id.* ¶ 20.

[12]  *See id.* ¶ 21.

[13]  *See id.* ¶ 21.

[14]  *See id.*

[15]  *See id.* ¶¶ 22, 23.

[16]  *See id.* ¶ 25.

-4-

supply contract.[17] These payments totaled approximately $14.8 million.[18] In 2003, in response to an investigation into the payments by C&A's Audit Committee, Stockman, Stepp, and McCallum made false statements to conceal the fraud.

## C. The Rebate Transactions

Supply contracts sometimes provide for suppliers to pay rebates if the parties conduct a specified volume of business.[19] Generally Accepted Accounting Principles ("GAAP") permit customers to take such rebates into account as purchase price reductions only when the specified business has been effected.[20]

In 2002, C&A's Purchasing Department began to arrange for suppliers to create documents that tied rebates to past purchases so that the rebates would have the immediate effect of increasing reported income.[21] One example occurred in 2002, when PPG Industries, Inc., a paint supplier, agreed to a rebate in return for new business. Barnaba, at C&A's direction, then solicited a side

---

17    *See id.* ¶ 23.

18    *See id.* ¶ 24.

19    *See id.* ¶ 26.

20    *See id.*

21    *See id.* ¶ 27.

-5-

letter stating that the rebate was based on past purchases.[22] This side letter was used to justify immediate recognition of the rebate, and served as a template for future side letters negotiated in a series of similar transactions.[23] Stockman, Cosgrove, Stepp, and Barnaba were involved in perpetrating the scheme.[24] Some of the transactions were negotiated by or at the direction of Stockman, who involved the Fabrics Division in the scheme in mid-2004.[25]

A variation of the false rebate transaction involved purchases of capital equipment. Under GAAP and federal income tax law, the purchase price of capital equipment cannot be immediately deducted as an expense in the period it is incurred, but can be depreciated over a time period that bears some relation to the expected lifetime of the equipment. GAAP specifies that rebates on capital equipment affect the purchase price of the equipment, and so cannot be recognized as immediate income.[26] However, C&A improperly characterized rebates received on capital purchases as income. Stockman, Barnaba, and Cosgrove produced false

---

22      *See id.* ¶ 28.

23      *See id.* ¶¶ 28-30.

24      *See id.* ¶¶ 30-32, 35, 38-40.

25      *See id.* ¶¶ 33-35, 37.

26      *See id.* ¶ 43.

documentation to support the fraudulent accounting treatment.[27]

## D.    Overstatement of Earnings

In August 2004, C&A sold $415 million in restricted senior

subordinated notes (the "Notes").[28]   The offering memoranda incorporated C&A's

financial statements from 2001 through the second quarter of 2004.[29]   Stockman,

Stepp, and Cosgrove participated in drafting these memoranda or presenting them

to investors.[30]   Stockman and Stepp certified that C&A's financial statements for

various segments of this period were accurate when they were made.[31]   C&A

misstated its earnings in the Forms 10-Q and 10-K that it filed with the SEC from

2001 through 2004.[32]   C&A also filed a registration statement (the "Registration

Statement")[33] in connection with the planned exchange of unrestricted notes for

---

27    *See id.* ¶¶ 43-48.

28    *See id.* ¶ 49.

29    *See id.*

30    *See id.*

31    *See id.* ¶ 50.

32    *See id.* ¶ 51.

33    *See* 1/27/05 SEC Form S-4, Collins & Aikman Corp., SEC Accession
No. 0000950136-05-000418.

the 2004 restricted notes (the "Notes Exchange").[34] This statement included C&A's financial statements from 2001 through third quarter 2004 and was signed by Stockman, Stepp, and Cosgrove.[35]

## E. False Statements

C&A repeatedly misrepresented its financial condition to investors.[36] These false statements were made, *inter alia*, during presentations and earnings calls that enabled C&A to obtain additional funding[37] and in a March 17, 2005 press release (the "March 17 Press Release") that misstated C&A's earnings.[38] At Stockman's direction, the March 17 Press Release falsely stated that C&A had $86 million available, though in actuality only twelve million dollars was accessible.[39] The March 17 Press Release also misstated the scope of the Audit Committee's investigation into the rebate transactions.[40]

---

[34] *See* Compl. ¶ 53.

[35] *See id.*

[36] *See id.* ¶ 54.

[37] *See id.*

[38] *See id.* ¶¶ 55-57.

[39] *See id.* ¶ 58.

[40] *See id.* ¶¶ 59, 61.

On March 17, Stockman (with Cosgrove's assistance) conducted a call with investors (the "Earnings Call"), during which he intentionally or recklessly made false statements regarding C&A's estimated income and capital expenditures for the first quarter 2005.[41] C&A also issued a press release on April 4, 2005 (the "April 4 Press Release") that stated C&A had approximately $81 million in "available liquidity" as of March 31, 2005, when in fact C&A had materially less.[42]

C&A also misstated its finances in order to enhance its ability to borrow money. The General Electric Capital Corporation ("GECC") made loans to C&A through a securitized accounts receivable facility.[43] At Stockman's direction, C&A added $120 million in ineligible receivables to the borrowing base under the GECC agreement.[44]

## F.     Prior Proceedings

On May 17, 2005, C&A filed for voluntary reorganization under

---

41      *See id.* ¶¶ 63-66.

42      *Id.* ¶ 68; *see id.* ¶¶ 67-71.

43      *See id.* ¶ 70.

44      *See id.*

-9-

Chapter 11 of the Bankruptcy Code.[45] The SEC brought this action on March 26, 2007. On March 30, 2007, C&A consented to entry of final judgment against it and waived its right to appeal.[46] On July 6, 2007, the United States Attorney for the Southern District of New York sought to intervene to stay discovery on the ground that eight of the Individual Defendants were also defendants in a criminal proceeding that relates to the same underlying facts.[47] On September 10, 2007, this Court granted the Government's motion to intervene and imposed a partial stay of discovery.[48]

In connection with these transactions, the SEC asserts that all defendants violated section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Exchange Act Rule 10b-5.[49] The SEC also asserts a variety of other claims against defendants.[50]

---

[45] See id. ¶ 10.

[46] See 3/30/07 Final Judgment as to Defendant Collins & Aikman Corporation.

[47] See 7/6/07 Letter from Helen V. Cantwell, Assistant United States Attorney; see also United States v. Stockman, 07 Cr. 220 (BSJ).

[48] See 9/10/07 Order.

[49] See Compl. ¶¶ 79-87.

[50] The section 10(b) claims are found in Count Two. The SEC also makes the following claims: that Stockman, Stepp, and Cosgrove violated section

-10-

## III.  LEGAL STANDARD

### A.  Motion to Dismiss

When deciding a defendant's motion to dismiss under Federal Rule of

Civil Procedure 12(b)(6), the court must "accept as true all of the factual

allegations contained in the complaint"[51] and "draw all inferences in the light most

_____

17(a) of the Securities Act of 1933, which prohibits the offering of securities by means of false statements, by selling the Notes (Count One); that Barnaba violated section 20(e) of the Exchange Act, which prohibits "provid[ing] substantial assistance" to another person in connection with a violation of the Exchange Act, for aiding and abetting C&A's violation of section 10(b) (Count Three); that the Individual Defendants aided and abetted C&A's violation of section 13(a) of the Exchange Act, which requires issuers of registered securities to file accurate reports with the SEC, in violation of section 20(e) (Count Five); that the Individual Defendants aided and abetted C&A's violation of section 13(b)(2) of the Exchange Act, which requires issuers of registered securities to maintain accurate financial books and record transactions in accordance with GAAP (Count Seven); that the Individual Defendants violated section 13(b)(5) of the Exchange Act, which prohibits circumvention of internal controls (Count Eight); that the Individual Defendants violated Rule 13b2-1 of the Exchange Act, which prohibits falsification of books subject to section 13(b)(2)(A) (Count Nine); that the Individual Defendants violated Rule 13b2-2 of the Exchange Act, which prohibits directors and officers and those acting under their direction from interfering with the investigation of an independent auditor (Count Ten); and that Stockman and Stepp violated Rule 13a-14 of the Exchange Act, which requires certain officers to file certificates in connection with reports filed pursuant to section 13(a) (Count Eleven).

[51]   *Bell Atlantic Corp. v. Twombly*, — U.S. —, 127 S. Ct. 1955, 1964 (2007). *Accord In re NYSE Specialists Sec. Litig.*, 503 F.3d 89, 95 (2d Cir. 2007).

favorable to the non-moving party[]."[52] Nevertheless, the court need not accord "[l]egal conclusions, deductions or opinions couched as factual allegations . . . a presumption of truthfulness."[53]

In deciding a motion to dismiss, the court is not limited to the face of the complaint, but "may [also] consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit."[54] However, "before materials outside the record may become the basis for a dismissal . . . it must be clear on the record that no dispute exists regarding the authenticity or accuracy of the document."[55]

"Federal Rule of Civil Procedure 8(a)(2) requires . . . 'a short and plain statement of the claim showing that the pleader is entitled to relief.'"[56] To survive a 12(b)(6) motion to dismiss, the allegations in the complaint must meet

---

[52]   *In re NYSE Specialists*, 503 F.3d at 95.

[53]   *Id.* (quotation omitted).

[54]   *ATSI Commc'ns v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).

[55]   *Faulkner v. Beer*, 463 F.3d 130, 134 (2d Cir. 2006).

[56]   *Erickson v. Pardus*, — U.S. —, 127 S. Ct. 2197, 2200 (2007) (quoting Fed. R. Civ. P. 8(a)(2)).

-12-

the standard of "plausibility."[57]  Although the complaint need not provide

"detailed factual allegations,"[58] it must "amplify a claim with some factual

allegations . . . to render the claim *plausible*."[59]  The standard is no longer that a

complaint can be dismissed only if there us "no set of facts" that plaintiff could

prove "which would entitle him to relief."[60]  Rather, the complaint must provide

"the grounds upon which [the plaintiff's] claim rests through factual allegations

sufficient 'to raise a right to relief above the speculative level.'"[61]

However, "[s]ecurities fraud claims are subject to heightened

pleading requirements that the plaintiff must meet to survive a motion to

dismiss."[62]  Those heightened pleading requirements are imposed by Federal Rule

---

[57]     *See Bell Atlantic*, 127 S. Ct. at 1970.

[58]     *Id.* at 1964. *Accord ATSI*, 493 F.3d at 98 n.2 (applying the standard of plausibility outside *Twombly's* anti-trust context).

[59]     *Iqbal v. Hasty*, 490 F.3d 143, 157-58 (2d Cir. 2007) (emphasis in original).

[60]     *Bell Atlantic*, 127 S. Ct. at 1969 (quoting *Conley v. Gibson*, 355 U.S. 45-46 (1957)). *Accord id.* ("The phrase is best forgotten as an incomplete, negative gloss on an accepted pleading standard").

[61]     *ATSI*, 493 F.3d at 98 (quoting *Bell Atlantic*, 127 S. Ct. at 1965).

[62]     *Id.* at 99.

of Civil Procedure 9(b).[63] A complaint alleging securities fraud must satisfy Rule 9(b)'s requirement that "the circumstances constituting fraud . . . be stated with particularity."[64] "This pleading constraint serves to provide a defendant with fair notice of a plaintiff's claim, safeguard his reputation from improvident charges of wrongdoing, and protect him against strike suits."[65] To comply with the requirements of Rule 9(b), a plaintiff must: "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent."[66] "Allegations that are conclusory or unsupported by factual assertions are insufficient."[67]

Where a complaint alleges a false statement, the complaint must

---

[63]     The heightened pleading standards imposed by the Private Securities Litigation Reform Act ("PSLRA") do not apply to actions brought by the SEC. *See* 15 U.S.C. § 78u-4(b) ("The provisions of this subsection shall apply in each private action arising under this title that is brought as a plaintiff class action pursuant to the Federal Rules of Civil Procedure.").

[64]     Fed. R. Civ. P. 9(b). *See also ATSI*, 493 F.3d at 99.

[65]     *ATSI*, 493 F.3d at 99 (citing *Rombach v. Chang*, 355 F.3d 164, 171 (2d Cir. 2004)).

[66]     *Rombach*, 355 F.3d at 170 (quotation omitted). *Accord ATSI*, 493 F.3d at 99 (citing *Novak v. Kasaks*, 216 F.3d 300, 306 (2d Cir. 2000)).

[67]     *ATSI*, 493 F.3d at 99.

-14-

"state with particularity the specific facts in support of [plaintiffs'] belief that [defendants'] statements were false when made."[68] In situations "[w]here plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information."[69]

## B. Exchange Act Section 10(b) and Rule 10b-5

### 1. Extent of Liability

Section 10(b) of the Exchange Act creates civil liability for a wide range of securities fraud.[70] Enacted in the wake of the stock market crash of 1929, it was intended to "protect investors engaged in the purchase and sale of securities by implementing a policy of full disclosure."[71] "[T]he Supreme Court has emphasized repeatedly that Section 10(b) 'should be construed not technically and restrictively, but flexibly to effectuate its remedial purposes.'"[72]

To state a claim under section 10(b), a plaintiff must allege that the defendant "(1) made a material misrepresentation or a material omission as to

---

[68] *Rombach*, 355 F.3d at 172 (quotation omitted).

[69] *Novak*, 216 F.3d at 309 (citation omitted).

[70] *See* 48 Stat. 881 (June 6, 1934), codified at 15 U.S.C. § 78a *et seq*.

[71] *United States v. Bilzerian*, 926 F.2d 1285, 1297 (2d Cir. 1991).

[72] *In re Parmalat Sec. Litig.*, 376 F. Supp. 2d 472, 501 (S.D.N.Y. 2005) (quoting *SEC v. Zandford*, 535 U.S. 813, 819 (2002)).

-15-

which he had a duty to speak, or used a fraudulent device; (2) with scienter; (3) in connection with the purchase or sale of securities."[73] Rule 10b-5, which interprets section 10(b), prohibits employment of a "scheme" to defraud. However, there is some tension between the proposition that participation in a fraudulent scheme is sufficient to incur liability and the Supreme Court's admonition in *Central Bank of Denver, N.A. v. First Interstate Bank, N.A.* that "the statute prohibits only the making of a material misstatement (or omission) or the commission of a manipulative act. . . . We cannot amend the statute to create liability for acts that are not themselves manipulative or deceptive within the meaning of the statute."[74]

Second Circuit precedent in this area is not a model of clarity. The circuit has held that an individual who "'participated in [a] fraudulent scheme'" can be a primary violator under section 10(b).[75] However, the circuit has also stated that "[a]llegations of 'assisting,' 'participating in,' 'complicity in' and

---

[73]     *SEC v. Monarch Funding Corp.*, 192 F.3d 295, 308 (2d Cir. 1999).

[74]     *Central Bank of Denver, N.A. v. First Interstate Bank, N.A.*, 511 U.S. 164, 177 (1994).

[75]     *SEC v. U.S. Envtl., Inc.*, 155 F.3d 107, 111 (2d Cir. 1998) (quoting *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1471 (2d Cir. 1996)). *Accord Levitt v. Bear Stearns & Co.*, 340 F.3d 94, 103 (2d Cir. 2003) ("In the wake of *Central Bank*, this Court has held that a primary violator is one who participated in the fraudulent scheme or other activity proscribed by the securities laws.") (quotations omitted).

similar synonyms . . . all fall within the prohibitive bar of *Central Bank*."[76]  Due

perhaps to this lack of guidance, district courts in this circuit have not reached a

consensus on whether participation in a scheme is sufficient to incur liability

under section 10(b).[77]

Analysis of liability under section 10(b) must begin with the text of

the statute, which provides that it is unlawful for any person "directly or

indirectly" to employ "any manipulative or deceptive device or contrivance in

contravention of such rules and regulations as the [SEC] may prescribe" in

connection with the sale of securities.[78]  Rule 10b-5 prohibits use of "any device,

---

[76]     *Shapiro v. Cantor*, 123 F.3d 717, 720 (2d Cir. 1997).

[77]     *Compare Parmalat*, 376 F. Supp. 2d at 501 ("[T]he Second Circuit . .
. ruled out the possibility that a defendant could be liable merely for 'participating'
in the misstatements or omissions of others without attribution to that defendant.")
*with In re Salomon Analyst AT&T Litig.*, 350 F. Supp. 2d 455, 472-73 (S.D.N.Y.
2004) ("[S]ubsections (a) and (c) of Rule 10b-5[] . . . describe causes of action for
behavior that constitutes participation in a fraudulent scheme, even absent a
fraudulent statement by the defendant.") *and Rich v. Maidstone Fin.*, No. 98 Civ.
2569, 2002 WL 31867724, at *8 n.6 (S.D.N.Y. Dec. 20, 2002) ("Despite the
language . . . that suggests otherwise, the Second Circuit continues to permit
plaintiffs to allege 'participation in' a securities fraud scheme as one manner in
which a plaintiff may state a claim under § 10(b) and Rule 10b-5."). *See generally*
*Salomon Analyst*, 350 F. Supp. 2d at 473 (observing that courts in this district
typically "permit[] claims against insiders that allege substantial knowing
participation or orchestration"); *Rich*, 2002 WL 31867724, at *8 n.6 (reviewing
Second Circuit precedent).

[78]     15 U.S.C. § 78j.

scheme, or artifice to defraud," making a misstatement of material fact, and

engaging in "any act, practice, or course of business which operates or would

operate as a fraud or deceit upon any person" in connection with the sale of

securities. But the SEC cannot expand liability beyond the scope imposed by the

statute,[79] and *Central Bank* clarified that the statute extends only to persons who

actually made material misstatements or employed deceptive devices.

What, then, does it mean to "participate" in a fraudulent scheme? A

person who participates in such a scheme by performing purely administrative

duties without knowledge of the purpose of the scheme has not employed a

manipulative or deceptive device and so has not incurred liability under section

10(b).[80] Similarly, a person who participates in a conspiracy to commit a

securities law violation but takes no concrete steps in furtherance of the violation

has not run afoul of the statute.[81] By contrast, a person who, in concert with

---

[79] *See Zandford*, 535 U.S. at 816 n.1 ("The scope of Rule 10b-5 is coextensive with the coverage of § 10(b) . . . .").

[80] It must be emphasized that the reason liability does not attach is not that the person lacks scienter. The question of scienter is never reached because as an initial matter, the person did not engage in the unlawful conduct.

[81] *See Dinsmore v. Squadron, Ellenoff, Plesent, Sheinfeld & Sorkin*, 135 F.3d 837 (2d Cir. 1998) (finding that *Central Bank* precludes action for conspiracy under section 10(b)).

others, participates in a securities fraud scheme by making false statements does incur liability under section 10(b).

Participation in a scheme can thus be sufficient for liability under section 10(b) only if that participation took the form of actions or statements that were independently deceptive or fraudulent. Where a person is alleged to have participated in a scheme to violate securities laws, it is necessary to examine closely the extent of the alleged participation to determine whether the person is accused of an actual misrepresentation or the employment of a fraudulent device. In the absence of such an accusation, a claim based on mere "participation" is legally insufficient.

This is not to suggest that there is no utility in pleading a fraudulent scheme. Several persons may act in concert to commit a violation of section 10(b) that might not be actionable were it not for their cooperation. For example, if one person were to *create* a false prospectus knowing that it would be transmitted to investors, and another were to then *transmit* that prospectus to investors knowing it to be false, each individual would have contravened the text of section 10(b) by employing a fraudulent device in connection with the sale of securities. Yet if a complaint described only the actions taken by the first person, omitting all mention of the second person, it would fail to describe with adequate specificity

how the individual violated section 10(b).

## 2. Scienter

Scienter, in relation to securities fraud, is "the intent to deceive, manipulate, or defraud."[82] Scienter can be pled by "alleging facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness."[83] "Where motive is not apparent, it is still possible to plead scienter by identifying circumstances indicating conscious behavior by the defendant, though the strength of the circumstantial allegations must be correspondingly greater."[84] Under this theory of scienter, a plaintiff must show that the defendant's conduct is "'at the least, conduct which is highly unreasonable and which

---

[82]   *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193-94 (1976).

[83]   *ATSI*, 493 F.3d at 99 (citing *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 168-69 (2d Cir. 2000)). The Supreme Court in *Tellabs, Inc. v. Makor Issues & Rights, Ltd.* noted that it had "previously reserved the question whether reckless behavior is sufficient for civil liability under § 10(b) and Rule 10b-5," but that "[e]very Court of Appeals that has considered the issue has held that a plaintiff may meet the scienter requirement by showing that the defendant acted intentionally or recklessly, though the Circuits differ on the degree of recklessness required." — U.S. —, 127 S. Ct. 2499, 2507 n.3 (2007). The Court declined to address the issue. *See id.* ("The question whether and when recklessness satisfies the scienter requirement is not presented in this case."). Thus, Second Circuit law, which permits scienter to be shown by recklessness, continues to bind this Court.

[84]   *Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001).

-20-

represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.'"[85]  Thus, an express allegation of deliberate misconduct can be sufficient to plead scienter.[86]  "The inquiry . . . is whether all of the facts alleged, taken collectively, give rise to a *strong inference* of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard."[87]

Scienter requires an inquiry independent from the question of whether the person committed a prohibited act.[88]  A person who negligently employs a deceptive device in connection with the sale of securities would have run afoul of the statute's text but would not incur liability due to the lack of scienter.

The PSLRA codified the strong inference requirement for pleading scienter in private securities actions, but that standard also applies to all actions brought in this Circuit that are governed by Rule 9(b).[89]  Thus, even though the

---

[85]  *Id.* (quoting *Honeyman v. Hoyt (In re Carter-Wallace, Inc. Sec. Litig.)*, 220 F.3d 36, 39 (2d Cir. 2000)).

[86]  *See Suez Equity Investors v. Toronto-Dominion Bank*, 250 F.3d 87, 100 (2d Cir. 2001).

[87]  *Tellabs*, 127 S. Ct. at 2509 (emphasis added).

[88]  *See U.S. Envtl.*, 155 F.3d at 111.

[89]  *See Turkish v. Kasenetz*, 27 F.3d 23 (2d Cir. 1994) (citing *Beck v. Manufacturers Hanover Trust Co.*, 820 F.2d 46, 50 (2d Cir. 1987)).

PSLRA does not apply to actions brought by the SEC, the SEC is subject to Rule 9(b) and must therefore plead a "strong inference" of scienter.

In *Tellabs*, the Supreme Court determined that to plead a "strong inference of scienter" in the context of the PSLRA, a complaint must allege facts that give rise to an inference of scienter at least as strong as any competing inference.[90] It is unclear whether district courts must now find that the inference of scienter raised in actions not governed by the PSLRA, but governed by Rule 9(b), be at least as compelling as any other inference. I need not reach this thorny (albeit interesting) issue, however, because I find that even under this heightened standard, the SEC has pled scienter.

### 3. Additional Elements[91]

Because section 10(b) creates liability for statements made "in connection with the sale or purchase of securities," liability attaches only if a person knows or should know that her statement will be communicated to

---

[90]    *Tellabs*, 127 S. Ct. at 2509.

[91]    In private actions, courts also require a plaintiff to demonstrate reliance, causation, and damages. These requirements, however, do not apply to actions brought by the SEC. *See SEC v. North Am. Research & Dev. Corp.*, 424 F.2d 63, 84 (2d Cir. 1970); *SEC v. KPMG LLP*, 412 F. Supp. 2d 349, 375 (S.D.N.Y. 2006).

investors.[92] An individual who perpetrates a fraud does not violate section 10(b) if the fraud is not connected to the sale of securities. A defendant need not have communicated the statement at issue directly to investors, but the defendant must either have known or should have known that the statement would be communicated to investors.[93]

Alleged misstatements must be material. "It is not enough that a statement is false or incomplete, if the misrepresented fact is otherwise insignificant."[94] A fact is considered material if there is a "substantial likelihood that a reasonable person would consider it important in deciding whether to buy or sell shares" of the stock.[95] Similarly, a plaintiff must show that there was a "substantial likelihood that the disclosure of [an] omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of

---

[92]    *Wright v. Ernst & Young LLP*, 152 F.3d 169, 175 (2d Cir. 1998).

[93]    *See id.* (citing *Anixter v. Home-Stake Prod.*, 77 F.3d 1215, 1226 (10th Cir. 1996)).

[94]    *Basic, Inc. v. Levinson*, 485 U.S. 224, 238 (1988). *Accord Glazer v. Formica Corp.*, 964 F.2d 149, 154 (2d Cir. 1992).

[95]    *Azrielli v. Cohen Law Offices*, 21 F.3d 512, 518 (2d Cir. 1994). *Accord Basic*, 485 U.S. at 231 (applying the materiality standard established in *TSC Indus. v. Northway Inc.*, 426 U.S. 438 (1976) to Rule 10b-5 actions).

information available,"[96] and that at the time of the investment, a reasonable

investor would have considered the omitted information as significant.[97] While

the materiality question is not often amenable to disposition as a matter of law,[98] if

"it cannot be said that a reasonable investor would consider [the statement in

question] important in light of adequate cautionary language that is set forth in the

applicable disclosure documents," then the alleged misstatement is immaterial as a

matter of law.[99]

## 4. Responsibility for Violative Actions

Liability under section 10(b) must be premised on a person's actions,

but it is not always clear when a certain false statement can be attributed to that

person. It is undoubtedly sufficient, however, if the defendant spoke or authored

the offending statement.

A common situation arises where a false or misleading statement is

contained in a document such as a prospectus or registration statement that has no

---

[96]     *TSC Indus.*, 426 U.S. at 449.

[97]     *See Glazer*, 964 F.2d at 154-55.

[98]     *See, e.g., Halperin v. eBanker USA.com*, 295 F.3d 352, 357 (2d Cir. 2002).

[99]     *In re Regeneron Pharm., Inc. Sec. Litig.*, No. 05 Civ. 3111, 2005 WL 225288, at *14 (S.D.N.Y. Feb. 1, 2005) (citing *Halperin*, 295 F.3d at 357).

single author. In this circuit, the "group pleading doctrine" creates "'a presumption that statements in prospectuses, registration statements, annual reports, press releases, [and] group-published information . . . are the collective work of those individuals with *direct involvement* in the everyday business of the company.'"[100] The allegation of direct involvement within the group is crucial to the operation of this doctrine.[101]

---

[100] *In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 641 (S.D.N.Y. 2007) (emphasis added) (quoting *In re BISYS Sec. Litig.*, 397 F. Supp. 2d 430, 438 (S.D.N.Y. 2005)). *Accord U.S. Envtl.*, 155 F.3d at 112 ("The Supreme Court in *Central Bank* never intended to restrict § 10(b) liability to supervisors or directors of securities fraud schemes while excluding from liability subordinates who also violated the securities laws.").

[101] *See In re Refco*, 503 F. Supp. 2d at 641. I note that three circuits have found that the group pleading doctrine was abrogated by the PSLRA. *See Winer Family Trust v. Queen*, 503 F.3d 319, 334-37 (3d Cir. 2007); *Financial Acquisition Partners v. Blackwell*, 440 F.3d 278, 287 (5th Cir. 2006); *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 437 F.3d 588, 602-03 (7th Cir. 2006), *rev'd on other grounds*, — U.S. —, 127 S. Ct. 2499 (2007). Although the PSLRA does not apply here, it could be argued that because the PSLRA is a codification of the pleading standard that applies in this circuit, group pleading is unacceptable under Rule 9(b).
    The Second Circuit has not addressed this issue, and the majority of courts in this district have found that the PSLRA does not abrogate group pleading. *See In re Refco*, 503 F. Supp. 2d at 641; *In re BISYS*, 397 F. Supp. 2d at 439 n.42 (collecting cases). I agree with the observation of Judge Gerard Lynch that "there [is no] apparent contradiction between the idea that each defendant's role must be pled with particularity and the fact that corporate officers may work as a group to produce particular document." *In re Refco*, 503 F. Supp. 2d at 641-42.

A related problem arises when a false statement is made by one person with the substantial involvement of another. *Central Bank* holds that assisting another in a violation of section 10(b) is not itself actionable under that section. But the Second Circuit has found several times that an "individual [can be] sufficiently responsible for [an] entity's speech such that he could properly be said to have *made* the false statement."[102]

## 5. Attribution Requirement

The Second Circuit recently held that under the "bright line standard" that applies in this district, a person cannot be liable under section 10(b) for a false statement unless the statement is attributed to that person at the time of its dissemination to the public.[103] According to the Circuit, the imposition of an attribution requirement is a consequence of *Central Bank*'s holding that liability only attaches for the specific actions prohibited by the text of section 10(b).[104] This reasoning, however, appears to be a *non sequitur*. *Central Bank*'s holding

---

[102]  *KPMG LLP*, 412 F. Supp. 2d at 375 (citing *First Jersey Sec.,* 101 F.3d at 1471 and *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63 (2d Cir. 2001)) (emphasis added).

[103]  *See Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147, 152 (2d Cir. 2007); *see also Wright*, 152 F.3d at 175.

[104]  *See Lattanzio*, 476 F.3d at 152.

that a person must commit a fraudulent act or make a false statement does not necessarily require that the misstatement be attributed to that person. As the Circuit has recognized in other cases, the attribution requirement has its roots in reliance.[105] An individual who relies on a statement that he believes was made by one person cannot then assert a claim against another.[106]

In private actions, the purpose behind the attribution requirement is immaterial because private plaintiffs must separately plead reliance. But in an action brought by the SEC, the issue is significant because the SEC need not plead reliance. If the attribution requirement is motivated by the need to show reliance, which I find to be the more cogent analysis, then it does not apply to actions brought by the SEC. Rather, the SEC need only allege that "the defendant was sufficiently responsible for the statement – in effect, caused the statement to be made – and knew or had reason to know that the statement would be disseminated to investors."[107] However, the reach of section 10(b) beyond the bright line standard is limited. While a defendant may be liable for her own false statement regardless of whether it was attributed to her, a defendant cannot be responsible

---

[105]   *See Wright*, 152 F.3d at 175 (citing *Anixter*, 77 F.3d at 1225).

[106]   *See id.*

[107]   *KPMG LLP*, 412 F. Supp. 2d at 375.

for a statement she did not make.

## C.    Other Claims

### 1.    Section 17(a) of the Securities Act

Section 17(a) makes it illegal for a person, in connection with the offer or sale of securities, "(1) to employ any device, scheme, or artifice to defraud, or (2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact . . . ; or (3) to engage in any transaction . . . which operates or would operate as a fraud or deceit upon the purchaser."[108]  The SEC is required to allege scienter for violations of section 17(a)(1), but not (2) or (3).[109]  Because the elements of section 17(a)(1) and section 10(b) are "essentially the same," if a complaint is sufficient to state a claim under section 10(b) and Rule 10b-5, it is also sufficient to state a claim under section 17(a).[110]

### 2.    Section 13(b)(5) of the Exchange Act

---

[108]    15 U.S.C. § 77q(a).

[109]    *See Aaron v. SEC*, 446 U.S. 680, 691, 697 (1980) ("It is our view, in sum, that the language of § 17(a) requires scienter under § 17(a)(1), but not under § 17(a)(2) or § 17(a)(3)."); *Sante Fe Indus. v. Green*, 430 U.S. 462, 476 (1977); *Ernst & Ernst*, 425 U.S. at 199.

[110]    *Monarch Funding Corp.*, 192 F.3d at 308.

Section 13(b)(5) of the Exchange Act provides that "[n]o person shall knowingly circumvent or knowingly fail to implement a system of internal accounting controls or knowingly falsify any book, record, or account" required to be maintained pursuant to section 13(b)(2).[111] Section 13(b)(2)(A) requires certain corporations to maintain "books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer . . . ."[112]

### 3. Rules 13b2-1 and 13b2-2

Rule 13b2-1 provides that "[n]o person shall, directly or indirectly, falsify or cause to be falsified, any book, record or account" maintained pursuant to section 13(b)(2)(A).[113] Scienter is not a requirement for violations of Rule 13b2-1.[114] Rule 13b2-2 prohibits directors, officers, and those acting under their direction from making false statements to auditors if it was or should have been known that those statements would lead to materially misleading financial

---

[111]    17 U.S.C. § 78m(b)(5).

[112]    *Id.* § 78m(b)(2)(A).

[113]    17 C.F.R. § 240.13b2-1.

[114]    *See SEC v. McNulty*, 137 F.3d 732, 740-41 (2d Cir. 1998).

-29-

statements.[115] The SEC has determined that scienter is not required for a violation of this Rule.[116]

### 4. Section 20(e) of the Exchange Act

Exchange Act section 20(e) provides that a person who "knowingly provides substantial assistance" to another who violates the Exchange Act is "deemed to be in violation of such provision to the same extent as the person to whom such assistance is provided."[117] While *Central Bank* made clear that there is no liability for aiding and abetting securities fraud under section 10(b), there is liability for aiding and abetting under section 20(e).[118] The distinction is significant in that only the SEC, not private plaintiffs, can bring a claim under section 20(e).

Pleading a violation of section 20(e) requires the complainant to allege facts that show "(1) the existence of a securities law violation by the

---

[115]    *See* 17 C.F.R. § 240.13b2-2.

[116]    *See* SEC Release No. 34-15570 ("[T]he Commission has determined that a 'scienter' requirement should not be included in the Rule. The inclusion of such a requirement would be inconsistent with the language of new section 13(b)(2)(A), which contains no words indicating that the Congress intended to impose a 'scienter' requirement.").

[117]    15 U.S.C. § 78t(e).

[118]    *See* 15 U.S.C. § 78t.

-30-

primary (as opposed to the aiding and abetting) party; (2) 'knowledge' of this
violation on the part of the aider and abettor; and (3) 'substantial assistance' by the
aider and abettor in the achievement of the primary violation."[119] In this Circuit,
the knowledge prong can be satisfied by proof of recklessness only if the alleged
aider and abettor breached a fiduciary duty.[120] Otherwise, the violation must be
knowing.[121]

## IV. DISCUSSION

The Complaint pleads with the requisite specificity each element of
its claims against each defendant. Defendants' motions to dismiss are therefore
denied in their entirety. Although many of defendants' challenges to the adequacy
of the Complaint can be addressed in a conclusory fashion, the adequacy of the
pleadings for the claims brought under section 10(b) and Rule 10b-5 merits more
expanded discussion.

### A. Exchange Act Section 10(b) and Rule 10b-5

---

[119]   *IIT v. Cornfeld*, 619 F.2d 909, 922 (2d Cir. 1980). *Accord United
States v. District Council*, No. 90 Civ. 5722, 2007 WL 2697135, at *16 (S.D.N.Y.
Sept. 17, 2007) (citing *IIT*).

[120]   *See Edwards & Hanly v. Wells Fargo Sec. Clearance Corp.*, 602 F.2d
478, 484 (2d Cir. 1979); *Armstrong v. McAlpin*, 699 F.2d 79, 91 (2d Cir. 1983).

[121]   *See Edwards & Hanly*, 602 F.2d at 484.

-31-

The Complaint alleges that C&A, Stockman, McCallum, and Stepp violated section 10(b) in connection with the Round-Trip Transactions.[122] It further charges that C&A, Stockman, Cosgrove, McCallum, and Barnaba violated section 10(b) in connection with the Rebate Transactions.[123] Finally, the SEC asserts that C&A and Stockman violated section 10(b) in connection with the March 17 Press Release,[124] Bond Presentation,[125] and the April 4 Press Release;[126] and that C&A, Stockman, and Cosgrove violated section 10(b) in connection with the Earnings Call.[127]

## 1.    The Individual Defendants

### a.    Stockman

In March 2002, Stockman negotiated an agreement whereby C&A would purchase a company from McCallum for seven million dollars more than its actual value, and McCallum would then return the excess in the form of "rebates"

---

[122]    *See* Compl. ¶ 81.

[123]    *See id.* ¶ 82.

[124]    *See id.* ¶ 83.

[125]    *See id.* ¶ 85.

[126]    *See id.* ¶ 86.

[127]    *See id.* ¶ 84.

from another company he owned.[128]  Stockman and McCallum also met in late 2002 to negotiate similar Round Trip Transactions.[129]  When C&A's Audit Committee investigated these transactions, Stockman made false statements to the Committee and provided false documents in an effort to conceal the fraud.[130]

Stockman was also involved in the Rebate Transactions.  He met with the employees of the Purchasing Department and identified suppliers to target, the size of the rebates to demand, and incentives to offer.[131]  He further instructed that income from these rebates be used to offset present income, although he knew or should have known that such accounting treatment was inappropriate.[132]  For example, during a May 27, 2003 conference call, Stockman instructed purchasing officials to increase income for the present quarter by "pulling ahead" rebates that should apply in future quarters.[133]  As a result, more than one million dollars in

---

128    *See id.* ¶ 22.

129    *See id.* ¶ 23.

130    *See id.* ¶ 25.

131    *See id.* ¶ 31.

132    *See id.*

133    *See id.*

rebates were improperly booked as income in that quarter.[134] At a meeting in North Carolina in May 2004, Stockman similarly instructed the Fabrics Division to solicit rebates and to create documentation that would justify treatment of these rebates as immediate income.[135]

The SEC has thus identified specific allegedly fraudulent statements made by Stockman and provided detailed information as to the content of their statements and the circumstances under which they were made. The facts alleged, taken as true, create an inference that Stockman acted deliberately to defraud investors, and this inference is at least as strong as any other inference that could be deduced from these facts.

Notwithstanding the clear inferences to be drawn from these allegations, Stockman asserts that they fail to present the requisite strong inference of scienter.[136] As discussed above, a plaintiff subject to Rule 9(b) must plead sufficient facts to raise a strong inference of scienter, and such an inference must be at least as strong as any competing inference raised by the pled facts. However,

---

[134]    *See id.* ¶ 32.

[135]    *See id.* ¶ 36.

[136]    Memorandum of Law in Support of Defendant David A. Stockman's Motion to Dismiss the Complaint, at 11-40.

-34-

"strong inference of scienter" is not a magic incantation that a defendant need merely recite to defeat all claims. Rule 9(b) demands specificity, but it does not demand that a plaintiff plead every fact that forms the alleged violations, and a defendant cannot defeat a claim by pointing to facts that are omitted if the allegations as pled meet the requisite standard. The SEC has provided detailed allegations that defendants deliberately engaged in a wide-ranging series of fraudulent transactions. Allegations of intentional misrepresentation are sufficient to plead scienter if the facts alleged are relatively strong.[137] The allegations in this Complaint are more than adequate to plead scienter even under the heightened standards imposed by the Supreme Court in *Tellabs*.

### b. McCallum

In late 2001, McCallum transferred three million dollars to C&A knowing that although it was a loan, C&A would account for the money as income.[138] In March 2002, McCallum agreed to accept three million dollars in equipment as repayment.[139] In that month, McCallum also agreed to sell a business to C&A for seven million dollars more than its actual value and repay the

---

[137]    *See Kalnit*, 264 F.3d at 142.

[138]    *See* Compl. ¶ 21.

[139]    *See id.*

difference as a "rebate."[140] McCallum also agreed to similar Round-Trip

Transactions with respect to other assets, and provided C&A with false

documentation to support this fraudulent activity.[141] In response to an

investigation into the transactions by C&A's Audit Committee, McCallum made

false statements and provided the Audit Committee with false documentation.[142]

Notwithstanding McCallum's arguments to the contrary, these allegations, taken

together, are more than sufficient to plead both falsity and scienter.

McCallum asserts that the SEC failed to allege facts that suggest

these transactions were false. In support of his contention, McCallum argues that

C&A's Audit Committee found that the transactions were not fraudulent.[143] This

is not persuasive. The Complaint alleges that defendants, including McCallum,

engaged in activities designed to conceal their fraud from the Audit Committee's

investigators.[144] The investigation's failure to discover deliberate wrongdoing

[140]   *See id.* ¶ 22.

[141]   *See id.* ¶ 23.

[142]   *See id.* ¶ 25.

[143]   *See* Memorandum in Support of Motion to Dismiss by Defendant
Elkin B. McCallum ("McCallum Mem."), at 10.

[144]   *See, e.g.,* Compl. ¶ 25 (alleging that "McCallum made false
statements to the Audit Committee").

may indicate that there was no wrongdoing, but it may also indicate that defendants successfully concealed such wrongdoing. If defendants are correct, the accuracy of the report will be borne out through discovery.

McCallum also argues that because he is not alleged to have any knowledge of how C&A intended to account for the false transactions, there is no reason to believe he acted with scienter.[145] However, the Complaint clearly alleges that McCallum entered into the Round-Trip Transactions knowing that C&A would book the loans as income.[146] Contrary to McCallum's contentions, the most compelling inference that can be drawn from these facts is that McCallum acted with scienter.

### c.    Stepp

The allegations against Stepp demonstrate how accusations of involvement in a fraudulent scheme can state a claim provided that they allege a specific use of a fraudulent device by the defendant. Stepp, C&A's Chief Financial Officer from 1995 to 1999 and 2002 to 2004 and consultant to C&A in

---

[145]    *See* McCallum Mem. at 14-16.

[146]    *See* Compl. ¶ 21. For this reason, McCallum's argument that he cannot be liable for aiding and abetting C&A's violations because he did not know of their intended accounting treatment fails as well. *See* McCallum Mem. at 19-20.

-37-

the interim,[147] is alleged to have participated in several of the fraudulent

transactions. With respect to the Round-Trip Transactions, the Complaint alleges

that Stepp "helped arrange and collect the payments from McCallum" and made

false statements to conceal the transactions from the Audit Committee

investigation.[148] Stepp is alleged to have supervised employees who negotiated

some of the Rebate Transactions, participated in meetings in which the

transactions were discussed, and known of the false documentation prepared to

support the transactions' fraudulent accounting.[149]

    In addition, the SEC alleges that in late 2001, Stepp informed

McCallum that the three million dollars he was asked to contribute to C&A would

be returned to McCallum in early 2002.[150] While this statement, on its own, might

not be sufficient to incur liability under section 10(b), in light of Stepp's alleged

involvement in the fraudulent schemes and his knowledge of the fraudulent nature

of the transaction at issue, it is sufficient to state a claim under section 10(b).

    Stepp argues that the claims against him fail because he is not

---

[147]    *See* Compl. ¶ 12.

[148]    *Id.* ¶ 25.

[149]    *See id.* ¶ 42.

[150]    *See id.* ¶ 21.

accused of making a fraudulent statement.[151] However, "[n]ot every violation of the anti-fraud provisions of the federal securities law can be, or should be, forced into a category headed 'misrepresentations' or 'nondisclosures'."[152] It is reasonable to infer from the allegations in the Complaint that Stepp's intent in making this statement to McCallum was an essential part of creating the deceptive financial statements that would be communicated to investors. The Complaint thus identifies a deceptive device intentionally used by Stepp in connection with the purchase or sale of securities.

### d. Cosgrove

The Complaint alleges that Cosgrove authored side letters for use in the Rebate Transactions knowing that such side letters would be used to fraudulently misrepresent C&A's income.[153] Cosgrove also advised C&A's Purchasing Department on drafting side letters to be used by that department in a similarly fraudulent manner.[154] The Complaint lists several other fraudulent

---

[151] *See* Memorandum of Law of J. Michael Stepp in Support of His Motion to Dismiss the Complaint ("Stepp Mem."), at 11.

[152] *Competitive Assocs. v. Laventhol, Krekstein, Horwath & Horwath,* 516 F.2d 811, 814 (2d Cir. 1975). *Accord In re Laser Arms Corp. Sec. Litig.,* 794 F. Supp. 475, 488 (S.D.N.Y. 1989).

[153] *See id.* ¶ 30.

[154] *See id.* ¶ 42.

transactions in which Cosgrove was involved. For example, in April 2004,

Cosgrove directed C&A personnel to obtain false documents from a supplier that

had agreed to participate in a one million dollar Rebate Transaction.[155] These

incidents constitute the use of a deceptive device in connection with the sale of

securities in violation of section 10(b).

Cosgrove argues that the Complaint fails to allege facts sufficient to

support a strong inference of scienter.[156] Cosgrove suggests that where motive is

not apparent, a plaintiff must allege "'deliberate illegal behavior'" to demonstrate

scienter.[157] Cosgrove misstates the law. Misbehavior does not require a finding of

illegal behavior. The Second Circuit has made clear that while deliberate illegal

behavior constitutes conscious misbehavior sufficient to support a strong inference

of scienter, behavior that is not necessarily criminal but is knowingly fraudulent is

also sufficient.[158] The facts alleged are more than adequate to support a strong

inference of scienter.

---

[155]    *See id.* ¶ 43.

[156]    *See* Memorandum of Law in Support of Defendant David R.
Cosgrove's Motion to Dismiss the Complaint ("Cosgrove Mem."), at 12.

[157]    *Id.* at 12 (quoting *Novak*, 216 F.3d at 308).

[158]    *See, e.g., Novak*, 216 F.3d at 213 (finding that a plaintiff successfully
pled scienter where "the Complaint alleges that the defendants engaged in
conscious misstatements with the intent to deceive").

Cosgrove also asserts that the Complaint is insufficient to plead falsity because it fails to identify the specific provision of GAAP that C&A allegedly violated.[159] However, Rule 9(b) does not require the court to delve into the minutiae of accounting regulations at the pleading stage. On the contrary, at this stage, it is sufficient for plaintiff to allege with specificity defendant's fraudulent actions. Because the SEC has alleged with particularity that Cosgrove intended to falsify C&A's financial statements, Cosgrove has more than adequate notice of the fraudulent activity at issue.[160]

### e . **Barnaba**

The Complaint alleges that as part of the Rebate Transactions, Barnaba "initially served as liaison between Cosgrove and C&A's Purchasing Department, knowingly conveying Cosgrove's directions on how the rebates should be structured to implement the fraud and ensuring that Cosgrove's instructions were carried out."[161] It further states that Barnaba "supervised Purchasing Department employees in soliciting documentation" for use with the

---

[159]   *See* Cosgrove Mem. at 17.

[160]   *Id.*

[161]   Compl. ¶ 42.

-41-

fraudulent rebates.[162]  While Barnaba is correct that allegations of involvement in a

scheme are insufficient to state a claim under section 10(b),[163] knowingly

supervising employees who are carrying out a fraudulent scheme is itself the

employment of a deceptive device.  These allegations, together with the

supporting facts alleged, are sufficient to state a claim.

## 2.    Other Issues

### a.    Materiality

Certain defendants argue that the transactions pled in the Complaint

were immaterial.[164]  SEC guidance indicates that "[q]ualitative factors may cause

misstatements of quantitatively small amounts to be material."[165]  Therefore,

"magnitude by itself, without regard to the nature of the item and the

circumstances in which the judgment has to be made, will not generally be a

---

[162]    *Id.*

[163]    *See* Memorandum of Law in Support of Defendant Paul C. Barnaba's
Motion to Dismiss ("Barnaba Mem."), at 12.

[164]    *See, e.g.,* McCallum Mem. at 17 (noting that the challenged
transactions resulted in a "paltry $14.8 million of revenue").

[165]    Staff Accounting Bulletin ("SAB") No. 99, 64 Fed. Reg. 45150,
45152 (1999).  The Second Circuit has described these standards as "persuasive . .
. for evaluating the materiality of an alleged misrepresentation."  *Ganino*, 228 F.3d
at 163.

-42-

sufficient basis for a materiality judgment."[166] Among the relevant factors is "[w]hether the misstatement involves concealment of an unlawful transaction."[167]

As noted, materiality is a mixed question of law and fact and is thus not generally suitable for treatment on a motion to dismiss. Surely investors would consider the involvement of officers of a company in complex and wide-ranging schemes to inflate the company's income to be material even if the scheme had not yielded substantial results. Thus, I cannot find, at this stage, that the alleged deception is immaterial as a matter of law.

## B. Aiding and Abetting C&A's Section 10(b) Violation

The Complaint alleges that Barnaba aided C&A's violation of section 10(b) in contravention of section 20(e) of the Exchange Act. Barnaba argues that it is not clear which violations he is accused of aiding and abetting. However, the Complaint alleges with specificity that Barnaba was involved in the Rebate Transactions, thus placing Barnaba on notice as to the transactions that he allegedly aided and abetted. The Complaint further alleges that Barnaba knew of the fraud perpetrated by C&A, and that he rendered substantial assistance in connection with the Rebate Transactions. The SEC has stated a claim against

---

[166]    SAB, 64 Fed. Reg. at 45152.

[167]    *Id.*

Barnaba for aiding and abetting liability.

## C. Section 17(a) of the Securities Act

The SEC asserts that Stockman, Stepp, and Cosgrove violated section

17(a) by releasing the Registration Statement knowing that it contained false

information.[168] The SEC has identified the statement, pled falsity and scienter as

discussed above, and adequately alleged that the statement was made in

connection with the sale of the Notes. The statement is attributable to these three

defendants under the group pleading doctrine. These allegations are therefore

sufficient to state a claim.

## D. Aiding and Abetting C&A's Section 13(a) Violations, Falsification of Financial Records, Misleading of Independent Auditors, and Filing of False Certifications

C&A allegedly filed false statements with the SEC in violation of

section 13(a) of the Exchange Act. Stockman, Stepp, Cosgrove, McCallum, and

Barnaba are allegedly responsible for aiding and abetting that violation in

contravention of section 20(e). The SEC further alleges that C&A failed to

---

[168] The SEC also alleges that these defendants violated section 17(a) by "participat[ing] in the road shows and/or prepar[ing] the materials for those road shows, knowing that those materials contained false or misleading information." Compl. ¶ 75. Were this the only allegation in this claim, I would be inclined to dismiss this claim. However, given that the other allegation is sufficient to state a claim, it is not necessary to partition this claim and dismiss one portion.

maintain accurate financial records and to establish adequate internal controls in violation of section 13(b), and was aided and abetted by Stockman, Stepp, Cosgrove, McCallum, and Barnaba. The SEC also claims that Stockman, Stepp, Cosgrove, McCallum, and Barnaba circumvented C&A's internal controls and falsified its financial records in contravention of section 13(b)(5). The Complaint further states that the defendants falsified C&A's records in violation of Rule 13b2-1 and misled C&A's auditors in violation of Rule 13b2-2. Finally, the Complaint alleges that Stockman and Stepp filed false certifications in connection with C&A's financial statements.

As described above, the Complaint adequately alleges that the defendants committed deceptive acts with the goal of distorting C&A's financial statements. For the same reasons, I find that the Complaint states a claim against defendants for aiding and abetting these violations.

Stepp contends that the Complaint fails to allege with sufficient particularity what false information was provided to C&A's auditors.[169] While the allegations with respect to violations of section 13 are indeed sparse, the Complaint is evaluated as a whole and defendants cannot succeed on a motion to dismiss by lifting certain claims out of context and asserting that they lack

---

[169]    *See* Stepp Mem. at 19.

specificity. The Complaint, viewed as a whole, provides detailed allegations about the false statements made by defendants to the auditors.

Barnaba argues that he cannot be liable for violations of Rule 13b2-1 because the SEC failed to allege that he was responsible for C&A's accounting or that he made false statements directly to an auditor.[170] Barnaba misstates the law. To state a claim under Rule 13b2-1, a plaintiff need only allege that the defendant "contributed to the issuance of materially misleading financial statements . . . ."[171] As detailed above, the SEC has alleged that Barnaba did contribute to the issuance of a materially misleading financial statement. Barnaba also asserts that the SEC's claim under section 13(b)(5) for evading C&A's internal accounting controls fails as a matter of law because the SEC has failed to specify which of C&A's internal controls Barnaba evaded.[172] Barnaba again misstates the law. Prior to discovery, the SEC need not have detailed knowledge of C&A's internal control system. To satisfy Rule 9(b), the SEC must only plead sufficient detail to demonstrate a plausible claim and must plead Barnaba's alleged fraudulent action with

---

[170]  *See* Barnaba Mem. at 25.

[171]  *SEC v. 800america.com, Inc.*, No. 02 Civ. 9046, 2006 WL 3422670, at *10 (S.D.N.Y. Nov. 28, 2006).

[172]  *See* Barnaba Mem. at 26.

specificity.[173] Requiring a plaintiff to provide the level of detail which Barnaba advocates would impose a burden beyond that contemplated by Rule 9(b).

Barnaba further argues that because he is not alleged to have made a statement directly to an auditor, the SEC has failed to state a claim for violation of Rule 13b2-2. Barnaba's argument is directly contradicted by the text of the Rule, which prohibits any person acting at the direction of an officer or director from "directly or *indirectly*" misleading a company's accountants.[174]

## V. CONCLUSION

For the reasons discussed above, defendants' motions to dismiss are denied. The Clerk of the Court is directed to close these motions (Nos. 50, 54, 58, 62, and 65 on the Docket Sheet). A conference is scheduled for January 25, 2008, at 3:30 p.m.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:      New York, New York
            December 21, 2007

---

[173]    *See Rombach*, 355 F.3d at 170.

[174]    *See* 17 C.F.R. § 140.13b2-2 (emphasis added).

-47-

## - Appearances -

**For Plaintiff**:

Christopher R. Conte, Esq.
J. David Fielder, Esq.
John David Worland, Jr., Esq.
Securities and Exchange Commission
100 F Street, NE
Washington, DC 20549
(202) 551-4438

Robert B. Blackburn, Esq.
Securities and Exchange Commission
Assoc. Regional Director
3 World Financial Center, Room 437
New York, NY 10281
(212) 336-1050

Mark Kreitman, Esq.
H. Michael Semler, Esq.
Securities and Exchange Commission
1875 Pennsylvania Avenue, NW
Washington, DC 10004
(202) 942-4677

**For Defendant David A. Stockman:**

Howard M. Shapiro, Esq.
Joseph Keith Brenner, Esq.
Andrew B. Weissman, Esq.
Wilmer Cutler Pickering Hale & Dorr, LLP
1875 Pennsylvania Avenue, NW
Washington, DC 20006
(202) 663-6606

**For Defendant J. Michael Stepp:**

Gandolfo Vincent DiBlasi, Esq.
David Edward Swarts, Esq.
Stacey Rubin Friedman, Esq.
Sullivan and Cromwell, LLP
125 Broad Street
New York, NY 10004
(212) 558-3836

**For Defendant Elkin B. McCallum:**

Jeffrey A. Simes, Esq.
Laurie L. Levin, Esq.
Richard Mark Strassberg, Esq.
Goodwin Procter, LLP
599 Lexington Avenue
New York, NY 10022
(212) 813-8879

**For Defendant Paul C. Barnaba:**

Carl Spencer Kravitz, Esq.
Lenora Miles Rigby, Esq.
Zuckerman Spaeder, LLP
1800 M Street NW, Suite 1000
Washington, DC 20036
(202) 778-1873

Adrienne Urrutia Wisenberg, Esq.
Solomon Louis Wisenberg, Esq.
Wisenberg & Wisenberg, PLLC
1711 N Street NW, Second Floor
Washington, DC 20036
(202) 261-3649

Laura Elizabeth Neish, Esq.
Zuckerman, Spaeder, Goldstein,
Taylor & Kolker, LLP
1540 Broadway, Suite 1604
New York, NY 10036
(212) 704-9600

**For Defendant Gerald E. Jones:**

Michael Ross, Esq.
Law Offices of Michael Ross
The Lincoln Building
60 East 42nd Street, 47th Floor
New York, NY 10165

**For Defendant David R. Cosgrove:**

Ken Laves Hashimoto, Esq.
Arnold & Porter, LLP

399 Park Avenue
New York, NY 10022
(212) 715-1077

**For Defendant John G. Galante:**

Michael Shapiro, Esq.
Buchanan Ingersoll PC
One Chase Manhattan Plaza
New York, NY 10005
(212) 440-4400 x4433

**For Defendants Collins & Aikman Corporation, Christopher M. Williams, and Thomas V. Gougherty:**

James Alfred Mitchell, Esq.
Stillman, Friedman & Shechtman, P.C.
425 Park Avenue
New York, NY 10022
(212) 223-0200

**For the United States:**

Helen Virginia Cantwell
Assistant U.S. Attorney
One St. Andrew's Plaza
New York, NY 10007
(212) 637-2200