UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X

SECURITIES AND EXCHANGE
COMMISSION,

Plaintiff,

- against -

COLLINS & AIKMAN CORP., *et al.*,

Defendants.

-------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 1/13/09

**OPINION AND ORDER**

**07 Civ. 2419 (SAS)**

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I.    INTRODUCTION

Several discovery disputes have arisen in the context of a large

securities fraud case brought by the Securities and Exchange Commission ("SEC")

against the Collins & Aikman Corporation ("C&A") and a number of individual

defendants.  Specifically, defendant David A. Stockman – former CEO of C&A –

has challenged the SEC's response to his requests for production.  These disputes

present important questions concerning the Government's discovery obligations in

civil litigation.

## I.    BACKGROUND[1]

The Complaint alleges that the defendants were involved in a securities fraud from late 2001 through early 2005.  The SEC asserts that C&A perpetrated various accounting frauds "designed in part to create the appearance that C&A's financial performance was improving under Stockman's direction."[2]  In 2001, C&A solicited a three million dollar loan that would be represented for accounting purposes as income.  The lender transferred the money to C&A in January 2002, and C&A recognized it as a reduction of costs that had the effect of increasing income.  Pursuant to its understanding with the lender, C&A later transferred three million dollars in equipment to the lender.  In late 2002, C&A further inflated its reported income by purchasing assets from the same lender at a price exceeding their market value in return for "rebates" of the excess.

Supply contracts sometimes provide for suppliers to pay rebates if the parties conduct a specified volume of business.  However, Generally Accepted Accounting Principles ("GAAP") permit customers to take such rebates into

---

[1]    The following facts, drawn from the Complaint, are taken from this Court's decision denying defendants' motion to dismiss the Complaint.  *See SEC v. Collins & Aikman Corp.*, 524 F. Supp. 2d 477, 479-82 (S.D.N.Y. 2007).  The repetition of these facts here is in no way a finding as to their accuracy.

[2]    Complaint ¶ 20.

-2-

account as purchase price reductions only when the specified business has been affected. In 2002, C&A's purchasing department arranged for suppliers to create documents that tied rebates to past purchases so that the rebates would have the immediate effect of increasing reported income.

A variation of the false rebate transaction involved purchases of capital equipment. Under GAAP and federal income tax law, the purchase price of capital equipment cannot be immediately deducted as an expense in the period it is incurred but can be depreciated over a time period that bears some relation to the expected lifetime of the equipment. GAAP specifies that because rebates on capital equipment affect the purchase price of the equipment, they cannot be recognized as immediate income. Nevertheless, C&A improperly characterized rebates received on capital purchases as income. Stockman and others produced false documentation to support the fraudulent accounting treatment.

C&A also misstated its earnings in the Forms 10-Q and 10-K that it filed with the SEC from 2001 through 2004 and repeatedly misrepresented its financial condition to investors. It additionally misstated its finances to the General Electric Capital Corporation in order to enhance its ability to borrow money. The SEC alleges that Stockman made each of these misstatements or that they were made at his behest.

-3-

In connection with these and other transactions, the SEC asserts that

all defendants violated section 10(b) of the Securities Exchange Act of 1934 (the

"Exchange Act") and Exchange Act Rule 10b-5. The SEC also asserts a variety of

other claims against defendants.[3]

## II. THE DISCOVERY DISPUTES

This opinion addresses four distinct but related discovery disputes.

Stockman served a document request pursuant to Rule 34, asking the SEC to

"produce for inspection and copying the documents and things identified" in fifty-

---

[3]    The SEC makes the following additional claims against Stockman:

- Violation of section 17(a) of the Securities Act of 1933, which prohibits the offering of securities by means of false statements;

- Violation of section 20(e) of the Exchange Act by aiding and abetting C&A's violation of section 13(a) of the Exchange Act, which requires issuers of registered securities to file accurate reports with the SEC;

- Aiding and abetting C&A's violation of section 13(b)(2) of the Exchange Act, which requires issuers of registered securities to maintain accurate financial books and record transactions in accordance with GAAP;

- Violation of section 13(b)(5) of the Exchange Act, which prohibits circumvention of internal controls;

- Violation of Exchange Act Rule 13b2-1, which prohibits falsification of books subject to section 13(b)(2)(A);

- Violation of Exchange Act Rule 13b2-2, which prohibits directors and officers and those acting under their direction from interfering with the investigation of an independent auditor; and

- Violation of Exchange Act Rule 13a-14, which requires certain officers to file certificates in connection with reports filed pursuant to section 13(a).

four separate categories.[4]  In response, the SEC produced 1.7 million documents

(10.6 million pages) maintained in thirty-six separate Concordance databases –

many of which use different metadata protocols.[5]  Stockman raises the following

objections.  *First*, the SEC failed to identify documents responsive to requests for

documents supporting particular factual allegations in the Complaint, preferring

instead to "dump" 1.7 million potentially responsive documents on Stockman and

then suggesting that he is capable of searching them to locate those that are

relevant.  *Second*, the SEC failed to perform a reasonable search for documents

relating to accounting principles governing supplier rebates – both in general and

with respect to the automobile industry.  Instead, the SEC unilaterally limited its

search to three of its divisions – and only if those divisions possessed "centralized

compilations of non-privileged documents dealing specifically with rebates or

accounting for rebates in the automobile industry."[6]  *Third*, the SEC improperly

---

[4]     *See* Defendant David A. Stockman's First Set of Requests for
Production of Documents and Things ("Stockman Request"), Ex. A to 8/15/08
Letter from Andrew B. Weissman, Stockman's attorney, to the Court ("Def. Let.").
Twenty-five of those requests are for documents that support factual allegations in
the complaint. *See* Requests 1-6, 11-24, and 27-31.

[5]     The databases do not match Stockman's individual requests.  Neither
party has explained what each database contains.

[6]     7/16/08 Letter from SEC to Stockman's attorney at 7-10, Ex. D to
Def. Let.

asserted the deliberative process privilege with regard to certain documents. *Fourth*, the SEC failed to search its own e-mails, attachments thereto, and other records created and maintained solely in an electronic format that related to either "(i) the investigation and litigation of this matter or (ii) the handling of several large cases unrelated to C&A and the Commission's regulatory role in matters relating to rebates and rebate accounting."[7] The objections were raised in a series of letters rather than by formal motion.[8]

These disputes raise four important questions concerning the responses of a government agency to routine discovery requests. (1) Whether identifying responsive documents that have been organized by the producing party invades the protection accorded to attorney work-product and how a government agency – acting in its investigative capacity – must respond to a request for the production of documents. (2) Whether a government agency may unilaterally

---

[7]    8/29/08 Letter from SEC to the Court ("SEC Let.") at 15.

[8]    I have already referenced Stockman's August 15, 2008 letter and the SEC's August 29, 2008 response. Stockman sent the Court a reply on September 12, 2008 ("Def. Reply"). While an apology from a court is a rare – possibly unprecedented – event, I hereby publicly apologize to the parties for the lengthy delay in resolving these disputes. I have no good excuse – other than the usual press of business – but I recognize that a failure to resolve disputes promptly impedes the "just, speedy, and inexpensive determination" of an action, as required by Rule 1 of the Federal Rules of Civil Procedure.

restrict the scope of its search based on an assertion of an "undue burden" on

limited public resources.  (3) How much information the Government must

disclose in order to allow an adversary – and the court – to assess an objection

based on the deliberative process privilege.  (4) Whether a government agency

may unilaterally exclude its own e-mail from document production on the ground

that most – but not all – will be privileged.

## III.  PRODUCTION OF RESPONSIVE DOCUMENTS

### A.  Request and Response

The SEC responded to each request for documents supporting a

factual allegation in the Complaint by claiming that it "does not maintain a

document collection relating specifically to the subject addressed."[9]  Rather it

provided an omnibus collection of indices, investigative documents, scanned

paper documents, and audio/video media.[10]  It also provided the location within

Concordance document databases of documents identified in the Complaint.  The

---

[9]     Commission's Response to Stockman's First Set of Requests for
Production ("SEC Response"), Ex. B to Def. Let., at 6-12, 17-24, 26-32, 35-39.
The responses note that "Stockman will have the same capacity as the Commission
to search for documents responsive to this request."  *Id.*

[10]     The SEC acknowledges that it provided Stockman with its complete
file concerning C&A (with the exception of privileged documents), rather than the
more limited universe of documents responsive to Stockman's requests for
production.  *See* SEC Let. at 2.

SEC contends that this production comports with the manner in which the

documents "'are kept in the usual course of business.'"[11]

      Stockman notes that the SEC has in fact already segregated

documents into "'approximately 175 file folders'" that correlate to specific factual

contentions and that these documents are now maintained in the usual course of

agency business.[12]   Stockman argues that by refusing to produce previously

identified documents, the SEC has provided an impermissible "document dump"

that buries the relevant evidence.[13]   The SEC contends that the "compilation itself

is attorney work product and its disclosure would reveal the 'mental impressions,

---

[11]     *Id.* at 3 (quoting Fed. R. Civ. P. 34(b)(2)(E)(i)).

[12]     Def. Let. at 3 (quoting 8/1/08 Letter from SEC to Stockman's attorney ("Aug. 1 Let."), Ex. C to Def. Let.).

[13]     *Id.* Part of the parties' problem is semantic. Stockman writes that he does "not ask for any compilation of materials from the Commission, only underlying fact documents that can easily be removed from any such compilation." *Id.* at 5. *Accord id.* at 3, n.4; Def. Reply at 2. Nonetheless, in its letter brief the SEC asserts privilege over "'Selection and Compilation' Work Product." SEC Let. at 4. Not surprisingly, legal argument by both parties then focused on whether document "compilations" are discoverable, despite Stockman's prior disclaimer. *See id.* at 4-7; Def. Reply at 1-6. To the extent that the "underlying fact documents" are one and the same as the existing compilations, the claim of work-product protection cannot be overcome by semantics alone. This Opinion will address the requested materials as compilations.

conclusions, opinions, and legal theories' of Commission counsel."[14]  The SEC

also concedes that the documents are not inaccessible, as review of massive

document databases is routinely conducted in large-scale commercial litigation

and presumably has occurred or will occur in this case.  Rather, the SEC claims

that Stockman seeks to determine the its litigation strategy through this

production.

Moreover, Stockman demands access to a collection of approximately

1,500 documents tagged by an SEC accountant using forty-five subject and

witness designations[15] and two collections of documents previously assembled by

Davis Polk & Wardwell ("DPW") during an internal investigation of C&A.[16]  The

SEC objects that the inclusion of those collections in the files maintained by its

lead litigation attorney is a result of "the same independent judgment" of the

attorney and therefore subject to work product protection.[17]

---

[14]     SEC Let. at 4 (quoting Fed. R. Civ. P. 26(b)(3)(B)).  *Accord* SEC
Response at 5.

[15]     *See* Def. Let. at 3 (citing Aug. 1 Let. at 2).

[16]     *See id.* at 5.

[17]     SEC Let. at 4 n.9.

## B.    Applicable Law

### 1.    Attorney Work Product Protection Applied to Selection and Compilation

The Second Circuit has recognized that the selection and compilation

of documents may fall within the protection accorded to attorney work product,

despite the general availability of documents from both parties and non-parties

during discovery.[18]  However, it has labeled this protection a "narrow exception"[19]

aimed at preventing requests with "the precise goal of learning what the opposing

attorney's thinking or strategy may be."[20]  Moreover, equity favors rejection of

---

[18]    *See Gould Inc. v. Mitsui Mining & Smelting Co.*, 825 F.2d 676, 679-80 (2d Cir. 1987) (citing *Sporck v. Peil*, 759 F.2d 312 (3d Cir. 1985)).  *See generally United States v. Bryan*, 339 U.S. 323, 331 (1950) ("'For more than three centuries it has now been recognized as a fundamental maxim that the public . . . has a right to every man's evidence.") (quoting John Henry Wigmore, *A Treatise on the Anglo-American System of Evidence in Trials at Common Law, Including the Statutes and Judicial Decisions of All Jurisdictions of the United States and Canada*, § 2192 (3d ed. 1940)).

[19]    *In re Grand Jury Subpoenas Dated Mar. 19, 2002 & Aug. 2, 2002*, 318 F.3d 379, 386 (2d Cir. 2003).  *Accord In re Grand Jury Subpoenas Dated Mar. 19, 2002 & Aug. 2, 2002*, No. M 11-189, 2002 WL 31040322, at *3 (S.D.N.Y. Sept. 12, 2002), *aff'd*, 318 F.3d 379 (2d Cir. 2003) (holding that the burden of proof lies on the party asserting the protection of the work product doctrine).

[20]    *In re Grand Jury Subpoenas Dated Oct. 22, 1991 & Nov. 1, 1991*, 959 F.2d 1158, 1166-67 (2d Cir. 1992).  *Accord Gould*, 825 F.2d at 680 (noting that protection "depends upon the existence of a real, rather than speculative, concern that the thought processes of [opposing] counsel in relation to pending or

work product protection to a compilation of documents that are otherwise unavailable or "beyond reasonable access."[21]  The Circuit has suggested that a court may permit *ex parte* communication of the strategy the withholding party wishes to conceal and *in camera* review of documents, so that the court may make an educated assessment whether production of the compilation will reveal a party's litigation strategy.[22]

If a court does find that work product protection applies to a document compilation, the requesting party must show "substantial need" for the materials and inability to obtain the substantial equivalent by other means without "undue hardship."[23]  The showing of need must be "'highly persuasive'" when discovery of "core work product is sought."[24]  "Core work product" is defined as an attorney's "mental impressions, conclusions, opinions, or legal theories" and is

anticipated litigation would be exposed").

[21]    *Gould*, 825 F.2d at 680.  These factors are largely redundant of the showings necessary to overcome the assertion of work product protection itself. *See* Fed. R. Civ. P. 26(b)(3).

[22]    *See In re Grand Jury Subpoenas Dated Mar. 19, 2002 & Aug. 2, 2002*, 318 F.3d at 386.

[23]    Fed. R. Civ. P. 26(b)(3).

[24]    *McGrath v. Nassau Co. Health Care Corp.*, No. 00 Civ. 6454, 2001 WL 1549260, at *3 (E.D.N.Y. Nov. 30, 2001) (quoting *In re Grand Jury Proceedings*, 219 F.3d 175, 190 (2d Cir. 2000)).

contrasted with "ordinary fact work product."[25]

Several cases that found a compilation of documents subject to work product protection addressed requests for compilations prepared to assist witnesses, rather than requests for information already arranged by subject matter.[26] Those requests focused on the attorney's thought process concerning witness preparation and strategy, rather than the broader facts of the case. On the other hand, Second Circuit cases rejecting application of work product protection addressed compilations of documents not otherwise available[27] or large compilations.[28]

### 2.    Form of Document Production

Under Rule 34 of the Federal Rules of Civil Procedure, a party has

---

[25]     *In re Grand Jury Subpoenas Dated Mar. 19, 2002 & Aug. 2, 2002*, No. M 11-189, 2002 WL 31040322, at *4 (S.D.N.Y. Sept. 12, 2002).

[26]     *See, e.g.*, *Berkey Photo, Inc. v. Eastman Kodak Co.*, 74 F.R.D. 613 (S.D.N.Y. 1977); *Sporck*, 759 F.2d at 312. *Cf. SEC v. Morelli*, 143 F.R.D. 42, 47 (S.D.N.Y. 1992) (prohibiting deposition of SEC attorney based on the work product doctrine where defendant's Rule 30(b)(6) notice was intended to "ascertain how the SEC intends to marshall the facts, [discover the] documents and testimony in [the SEC's] possession, and to discover the inferences that [the SEC] believes properly can be drawn from the evidence it has accumulated").

[27]     *See, e.g.*, *In re Grand Jury Subpoenas Dated Mar. 19, 2002 & Aug. 2, 2002*, 318 F.3d at 387.

[28]     *See Grand Jury Subpoenas Dated Oct. 22, 1991 & Nov. 1, 1991*, 959 F.2d at 1167.

two options for the production of documents in response to a discovery request.

The litigant may either produce documents "as they are kept in the usual course of

business or must organize and label them to correspond to the categories in the

request."[29] The Advisory Committee Note states that the purpose of this new rule

language – added in 1980 – was to eliminate the practice of "'deliberately

[mixing] critical documents with others in the hope of obscuring significance.'"[30]

Allowing the production of documents as they "are actually kept in the usual

course of business" was intended to minimize the burden of production while

maintaining the "internal logic reflecting business use."[31]

Rule 34 does not elaborate on the term "usual course of business." A

party choosing to produce documents as maintained in the ordinary course of

business "bears the burden of demonstrating that the documents made available

---

[29]   Fed. R. Civ. P. 34(b)(2)(E)(ii).

[30]   Fed. R. Civ. P. 34 1980 Advisory Committee Note (quoting Section of Litigation, Am. Bar Ass'n, *Report of the Special Committee for the Study of Discovery Abuse*, at 22 (1977), *reprinted in* 92 F.R.D. 149 (1982)).

[31]   *Report of the Special Committee for the Study of Discovery Abuse*, 92 F.R.D. at 177. *Accord CooperVision, Inc. v. CIBA Vision Corp.*, No. 06 Civ. 149, 2007 WL 2264848, at *4 (E.D. Tex. Aug. 6, 2007) ("Clearly, the underlying assumption was that production of records as kept in the usual course of business ordinarily will make their significance pellucid.").

were in fact produced consistent with that mandate."[32]  In most cases, documents

produced pursuant to Rule 34 will be organized by subject matter or category.[33]

The provision prohibits "simply dumping large quantities of unrequested materials

onto the discovering party along with the items actually sought."[34]

### C. Discussion

#### 1.    Work Product Protection

It is first necessary to determine the level of protection afforded to the

*selection* of documents by an attorney to support factual allegations in a

complaint.  Such documents are not "core" work product.  Core work product

constitutes legal documents drafted by an attorney – her mental impressions,

conclusions, opinions, and legal theories.  This highest level of protection applies

to a compilation only if it is organized by legal theory or strategy.  The SEC's

theory – that every document or word reviewed by an attorney is "core" attorney

---

[32]     *Pass & Seymour, Inc. v. Hubbell Inc.*, No. 07 Civ. 945, 2008 WL
4240490 (N.D.N.Y. Sept. 12, 2008) (citing, *inter alia*, *Johnson v. Kraft Foods N.
Am.*, 236 F.R.D. 535, 540-41 (D. Kan. 2006)).

[33]     *See, e.g.*,  *Estate of Townes Van Zandt v. Eggers*, No. 05 Civ. 10661,
2007 WL 3145097, at *2 (S.D.N.Y. Oct. 26, 2007); *Morgan v. City of New York*,
No. 00 Civ. 9172, 2002 WL 1808233, at *4 (S.D.N.Y. Aug. 6, 2002).

[34]     8A Charles Alan Wright, Arthur R. Miller, and Richard L. Marcus,
*Federal Practice & Procedure*, § 2213 (2008) (citing *Rothman v. Emory Univ.*,
123 F.3d 446 (7th Cir. 1997)).

work product – leaves nothing to surround the core.[35]  The first step in responding

to any document request is an attorney's assessment of relevance with regard to

potentially responsive documents.  It would make no sense to then claim that an

attorney's determination of relevance shields the selection of responsive

documents from production.

Moreover, the selection of documents according to facts alleged in a

pleading does not elevate the compilation to core work product.  Although a

complaint includes some amount of legal theory and strategy, Rule 11 of the

Federal Rules of Civil Procedure requires all parties to have "evidentiary support"

for the factual contentions in their pleadings.[36]  Given that requirement, producing

the  compilations of documents that support the factual allegations of a complaint

reveals no more than that already revealed by the filing of the complaint.  Thus is

it no surprise that in one recent case outside the Circuit, a court required plaintiffs

to provide the location of documents that supported factual allegations in the

complaint, even when the documents were already in defendants' possession in an

---

[35]     While I am not aware of how the SEC identified the documents for its
compilations, if this was achieved through the use of digital search techniques, it
is even less likely that true "work product" – attorneys' analysis and litigation
strategy – would be gleaned from document compilations.

[36]     Fed. R. Civ. P. 11(b)(3).

-15-

omnibus production similar to the one in this case.[37]

Even if this compilation were entitled to any work product protection – on the tenuous theory that the compilation was prepared in anticipation of litigation – Stockman has demonstrated that he has a "substantial need for the materials . . . and cannot, without undue hardship, obtain their substantial equivalent by other means."[38] The need for the material is obvious. While the responsive documents exist somewhere in the ten million pages produced by the SEC, the production does not respond to the straightforward request to identify documents that support the allegations in the Complaint, documents Stockman clearly must review to prepare his defense.

The question of "undue hardship" is more interesting. The SEC contends that Stockman can search through the ten million pages and find substantially the same documents identified by the SEC without impinging on the

---

[37]    *See Plumbers & Pipefitters Local 572 Pension Fund v. Cisco Systems, Inc.*, No. C01-20418, 2005 WL 1459555, at *6 (N.D. Cal. June 21, 2005). While the SEC correctly notes that the defendants in *Plumbers & Pipefitters* had not asked for a pre-existing compilation, *see* SEC Let. at 6 n.13, the substance of the request in that case – "documents actually referenced in the [Complaint] or which otherwise constitute evidence supporting or relating to those allegations" – is identical to the disputed requests here. Compiling responsive documents prior to a proper request cannot shield them from discovery.

[38]    Fed. R. Civ. P. 26(b)(3).

-16-

thought processes of the SEC attorneys. Indeed – at significant expense and delay – Stockman could search the document databases using appropriate search terms, but the inaccuracy of such searches is by now relatively well known.[39] A page-by-page manual review of ten million pages of records is strikingly expensive in both monetary and human terms and constitutes "undue hardship" by any definition.[40]

Moreover, the Second Circuit has expressly stated that equitable considerations may be weighed when determining the scope of the "narrow exception" protecting the "selection and compilation of documents by counsel for litigation purposes" based on the work product doctrine.[41] While not deciding the

_____

[39]    *See* George L. Paul and Jason R. Baron, *Information Inflation: Can the Legal System Adapt?*, 13 Rich. J. L. & Tech. 10, at \*36-\*40 (2007); Jason R. Baron, David D. Lewis, and Douglas W. Oard, *TREC-2006 Legal Track Overview*, *available at* http://trec.nist.gov/pubs/trec15/papers/LEGAL06.OVERVIEW.pdf (noting in a sophisticated study that compared to more complex and costly techniques, Boolean searching located only 57% of known relevant documents, while expert manual searching located 68%). Such a search would be further frustrated by the differing metadata protocols used in the numerous Concordance databases.

[40]    The SEC believes that Stockman can undertake this search without incurring an "undue cost and burden" and that he likely will undertake such a search even if the SEC is required to identify which documents in its collection support the various specific factual allegations in its Complaint. This belief – while perhaps accurate – is disputed by Stockman and is essentially irrelevant. Even if Stockman is willing to assume the cost of this search, in this Court's view it is unduly burdensome and wholly unnecessary.

[41]    *Gould*, 825 F.2d at 680.

question in that case, the Second Circuit did note that the "equities might not favor the application of the . . . exception if the files from which documents had been culled . . . were . . . beyond reasonable access . . . ."[42]  It is patently inequitable to require a party to search ten million pages to find documents already identified by its adversary as supporting the allegations of a complaint.   Thus, under either the undue hardship analysis of Rule 26 or the equities suggested by the Second Circuit, the 175 file folders prepared by the SEC's attorney are not protected by the work product doctrine.

By the same token, neither the set of documents labeled by an SEC accountant nor the documents provided by DPW are entitled to any work product protection.   These compilations do not reflect the "mental impressions, conclusions, opinions, and legal theories" of counsel for the SEC.   The SEC's claim that the documents were only *retained* as a collection because of the decision of counsel is not enough to place them within the realm of its attorney's work product.[43]  Permitting a party to shield production of a compilation simply

---

[42]    *Id.*

[43]    Given that the Office of the United States Attorney for the Southern District of New York produced the DPW binders in the parallel criminal prosecutions – presumptively to Stockman, along with his three co-defendants – and withdrew its prior objection to this production, *see* 7/30/08 Letter from Marc P. Berger, Assistant United States Attorney, to the Court, Ex. F to Def. Let., the

because an attorney makes the decision to *continue* to hold the documents in the same manner would result in impermissible gamesmanship and an unwarranted expansion of the work product doctrine.

### 2. Form of Production

The SEC contends that even if the compilations are not protected as work product, it has the option of producing the complete, unfiltered, and unorganized investigatory file, as this is how the documents are maintained in the usual course of its business. As noted above, Rule 34 mandates that documents must be produced organized by the subjects of the request or organized as they are kept in the usual course of business by the producing party. The key to this dichotomy is the assumption that in either case the documents will be organized – that records kept in the usual course of business would not be maintained in a haphazard fashion. Thus regardless of the form chosen, the production will be useful to the requesting party, and neither choice will inject unnecessary time and cost into litigation.

In order to determine what constitutes an appropriate production of records as they are kept in the "usual course of business," it is first necessary to

---

Court is somewhat baffled as to why the SEC continues to object to their production in this case.

define that term.[44]  To begin with, not every litigant is a business or functions in

the manner of a business.  Black's Law Dictionary defines a business as "[a]

commercial enterprise carried on for profit; a particular occupation or employment

habitually engaged in for livelihood or gain."[45]  Only as a secondary definition,

business constitutes "[b]y extension, transactions or matters of a noncommercial

nature."[46]

Congress debated a similar issue in the context of Federal Rule of

Evidence 803(6), the exception to the hearsay rule for records of regularly

conducted business activity.  The original proposal for the Rule – submitted by the

United States Supreme Court to Congress – would have permitted a record made

"in the course of a regularly conducted activity" to be admissible in certain

---

[44]     Surprisingly, this term is neither defined nor explained in the advisory
committee notes.  Nor are there records of congressional debate or cases defining
the term.  In contrast, there is substantial background concerning Federal Rule of
Evidence 803(6), which addresses "regularly conducted business activity."  I will
discuss this provision below.  As Federal Rule of Evidence 803(6) predates the
relevant provision in Federal Rule of Civil Procedure 34 by six years, the history
of the evidentiary rule is instructive – albeit non-binding – to the interpretation of
the procedural rule.

[45]     *Black's Law Dictionary* 211 (8th ed. 2004).

[46]     *Id.*

-20-

circumstances.[47]  The House Judiciary Committee concluded, however, that "there were insufficient guarantees of reliability in records made in the course of activities falling outside the scope of 'business' activities as that term is broadly defined in 28 U.S.C. § 1732."[48]  The House Committee thus amended the proposed Rule to limit its scope to business records, defining "business" to include "business, profession, occupation and calling of every kind."[49]

The Senate Judiciary Committee eliminated the business requirement inserted by the House, but the business provision was eventually reinstated in the Conference Committee.[50]  "The Conferees changed the definition of 'business' contained in the House provision in order to make it clear that the records of institutions and associations like schools, churches and hospitals are admissible

---

[47]      Fed. R. Evid. 803(6), 1972 Advisory Committee Note.  The justification for the Rule is found in the 1972 Advisory Committee Note to the proposed rule: "The element of unusual reliability of business records is said variously to be supplied by systematic checking, by regularity and continuity which produce habits of precision by actual experience of business in relying upon them, or by a duty to make an accurate records as part of a continuing job or occupation."  *Id.*  The Committee noted that the key concepts in this exception are "routineness and repetitiveness."  *Id.*

[48]      28 U.S.C. § 1732 refers in pertinent part to "any business, institution, member of a profession or calling, or any department or agency of government."

[49]      Fed. R. Evid. 803(6), 1972 Advisory Committee Note.

[50]      *See id.*

-21-

under [Rule 803(6)]."[51]  In its final form, Rule 803(6) defines business as any "business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit."[52]

By rough analogy to Rule 803(6), the option of producing documents "as they are kept in the usual course of business" under Rule 34 requires the producing party to meet either of two tests. *First*, this option is available to commercial enterprises or entities that function in the manner of commercial enterprises. *Second*, this option may also apply to records resulting from "regularly conducted activity."[53]  Where a producing party's activities are not "routine and repetitive" such as to require a well-organized record-keeping system – in other words when the records do not result from an "ordinary course of business" – the party must produce documents according to the sole remaining option under Rule 34: "organize[d] and label[ed] . . . to correspond to the

---

[51]     *Id.*

[52]     Fed. R. Evid. 803(6).

[53]     *Cf. United States v. Feliz*, 467 F.3d 227 (2d Cir. 2006) (permitting autopsy reports prepared by the Office of the Chief Medical Examiner of New York to be admitted as business records because this office conducts thousands of routine autopsies every year); *United States v. Doyle*, 130 F.3d 523 (2d Cir. 1997) (distinguishing between records created in the course of "regularly conducted business activity" admissible under Rule 803(6) and "records of public offices or agencies" admissible under Rule 803(8).

categories in the request."[54]

The logic of Rule 34 supports this limitation. When records do not result from "routine and repetitive" activity, there is no incentive to organize them in a predictable system. The purpose of the Rule is to facilitate production of records in a useful manner and to minimize discovery costs; thus it is reasonable to require litigants who do not create and/or maintain records in a "routine and repetitive" manner to organize the records in a usable[55] fashion prior to producing them.

How does this rule apply to the Government? In many cases, the Government acts in the manner of a commercial entity by – for instance – purchasing equipment from defense contractors, selling maps to backpackers, and executing contracts to construct buildings. In such cases, records will be generated reflecting purchases and sales, employee performance and salaries. Presumptively those records are created and maintained in an efficient fashion such that production as they are kept in the ordinary course of business would allow for easy analysis of – for example – a contract, False Claims Act, or a Title

---

[54]    Fed. R. Civ. P. 34(b)(2)(E)(i).

[55]    *Cf.* Fed. R. Civ. P. 34(b)(2)(E)(ii) ("[A] party must produce [electronically stored information] in a form . . . in which it is ordinarily maintained or in a reasonably *usable* form . . . .") (emphasis added).

VII claim.

However conducting an investigation – which is by its very nature not routine or repetitive – cannot fall within the scope of the "usual course of business." While the SEC routinely collects and maintains regulatory submissions such 10-K reports, in its investigative capacity the agency conducts tailored probes of a company or an industry, requiring the gathering of records from diverse sources. Many if not most of the 1.7 million documents in the SEC production here were likely collected in the agency's investigatory role. Thus it is no surprise that the complete collection is maintained as it was collected – in large disorderly databases. The documents can only be provided in a useful manner if the agency organizes or labels them to correspond to each demand. Based on the SEC's submission, it appears that this has already been done through the lead litigation attorney's creation of the 175-plus file folders at issue.

Therefore, the SEC must respond to Stockman's request for production by providing him with the documents that respond to those requests. Stockman has not requested the SEC file folders as such, but many of them correlate with the factual allegations in the Complaint, the subjects of the requests. Thus, to the extent that one or more of the 175 folders assembled by the SEC's attorneys constitute the complete set of documents relevant to a particular request,

they must be produced.  Similarly, to the extent that compilations made by the

SEC's accountant and those contained in the DPW binders are responsive to a

request, they also must be produced.

## IV.    GENERAL SUBJECT-MATTER DOCUMENTS

### A. Request and Response

Stockman has also made six requests for documents related to SEC

enforcement actions involving rebates, SEC policy related to rebates, rebate policy

specific to the automotive industry, a particular General Motors filing, and

testimony concerning automotive rebates.[56]    Stockman justified these requests by

noting that a key allegation in the Complaint is that Stockman participated in

C&A's improper accounting for rebates received from suppliers.  Stockman

argues that such rebate transactions were common in the automobile industry

during the relevant time period.  Finally, Stockman asserts that "[b]ecause the

accounting principles applicable to C&A's rebate transactions play a central role

in the Commission's allegations . . . [he is] seeking documents in the

Commission's possession, custody or control concerning principles governing

accounting for such rebate transactions and specific accounting practices in the

---

[56]      *See* Stockman Request at 12-14 (Requests 42-43, 45-48).

automobile industry for such transactions during the relevant period[.]"[57]  The

SEC objected to each of these requests as overbroad and unduly burdensome and

to some as vague, ambiguous, and lacking reasonable particularity.[58]   Moreover,

the SEC has rejected Stockman's proposal that it establish a search protocol that

would balance identification and disclosure of relevant documents against a strain

on agency resources.  Rather, the SEC unilaterally limited its search to

"centralized compilations" in three selected divisions; these searches turned up

nothing.[59]  It claims that the "massive endeavor" of manual searches of large

collections of paper records from analogous cases is "neither justified nor

required."[60]  It also states that records concerning rebate policy and regulatory

enforcement are maintained "by registrant, not topic" and primarily in paper form,

making the burden of production disproportionate to the value of the litigation.[61]

### B.    Applicable Law

---

[57]     Def. Let. at 11-12.

[58]     *See* SEC Response at 47-49, 50-55.

[59]     *Id.* at 14-15 (quoting 7/16/08 Letter from SEC to Stockman's attorney
at 9, Ex. D to Def. Let.).  The SEC inquired within the Division of Enforcement,
the Office of the Chief Accountant, and the Division of Corporate Finance.

[60]     SEC Let. at 9.

[61]     *Id.* at 10.

"A district court has wide latitude to determine the scope of

discovery."[62]  The general scope of discovery in civil litigation is defined by Rule

26(b)(1).

> Parties may obtain discovery regarding any nonprivileged
> matter that is relevant to any party's claim or defense . . . .
> For good cause, the court may order discovery of any
> matter relevant to the subject matter involved in the action.
> Relevant information need not be admissible at the trial if
> the discovery appears reasonably calculated to lead to the
> discovery of admissible evidence.

A court must limit the "frequency or extent of discovery" if one of three

conditions in Rule 26(b)(2)(C) is present.  The third limits production when "the

burden or expense of the proposed discovery outweighs its likely benefit,

considering the needs of the case, the amount in controversy, the parties'

resources, the importance of the issues at stake in the action, and the importance of

the discovery in resolving the issues."[63]  The burden or expense may be defined in

terms of time, expense, or even the "adverse consequences of the disclosure of

sensitive, albeit unprivileged material."[64]

---

[62]   *In re Agent Orange Product Liab. Litig.*, 517 F.3d 76, 103 (2d Cir.
2008).

[63]   Fed. R. Civ. P. 26(b)(2)(C)(iii).

[64]   *Johnson v. Nyack Hosp.*, 169 F.R.D. 550, 562 (S.D.N.Y.1996) (citing
*Herbert v. Lando*, 441 U.S. 153, 177 (1979)).

## C.    Discussion

The SEC's blanket refusal to negotiate a workable search protocol responsive to these requests is patently unreasonable.  Stockman has made a convincing case that he is seeking relevant information well within the scope of discovery permitted by Rule 26(b)(1) and that proportionality considerations should not foreclose a broader search effort than that already conducted by the SEC.   Although party resources must be taken into account under Rule 26(b)(2)(C), these requests seem particularly reasonable in an action initiated by the SEC.  Like any ordinary litigant, the Government must abide by the Federal Rules of Civil Procedure.  It is not entitled to special consideration concerning the scope of discovery, especially when it voluntarily initiates an action.[65]

With few exceptions, Rule 26(f) requires the parties to hold a conference and prepare a discovery plan.  The Rule specifically requires that the discovery plan state the parties' views and proposals with respect to "the subject on which discovery may be needed . . . and whether discovery should be conducted in phases or be limited to or focused on particular issues"[66] and "any

---

[65]     The calculus might differ where the Government must defend against allegations that may have little merit but can be enormously expensive to litigate.

[66]     Fed. R. Civ. P. 26(f)(3)(B).

-28-

issues about disclosure or discovery of electronically stored information . . . ."[67]

Had this been accomplished, the Court might not now be required to intervene in

this particular dispute. I also draw the parties' attention to the recently issued

Sedona Conference Cooperation Proclamation, which urges parties to work in a

cooperative rather than an adversarial manner to resolve discovery issues in order

to stem the "rising monetary costs" of discovery disputes.[68]  The Proclamation

notes that courts see the discovery rules "as a mandate for counsel to act

cooperatively."[69]  Accordingly, counsel are directly to meet and confer forthwith

and develop a workable search protocol that would reveal *at least some* of the

---

[67]     Fed. R. Civ. P. 26(f)(3)(C).

[68]     Shira A. Scheindlin, Daniel J. Capra, & The Sedona Conference,
*Electronic Discovery and Digital Evidence, Cases and Materials* 454 (2008)
(quoting The Sedona Conference Cooperation Proclamation). *Accord Mancia v.
Mayflower Textile Servs. Co.*, 253 F.R.D. 354, 365 (D. Md. 2008) (describing the
unnecessary costs resulting from a failure to engage in cooperative discovery
practices).

[69]     Scheindlin, Capra, & The Sedona Conference at 455 (citing *Board of
Regents of Univ. of Neb. v. BASF Corp.*, No. 04 Civ 3356, 2007 WL 3342423, at
*5 (D. Neb. Nov. 5, 2007) ("[T]he overriding theme of recent amendments to the
discovery rules has been open and forthright sharing of information by all parties
to a case with the aim of expediting case progress, minimizing burden and
expense, and removing contentiousness as much as practicable.  If counsel fail in
this responsibility – willfully or not – these principles of an open discovery
process are undermined, coextensively inhibiting the courts' ability to objectively
resolve their clients' disputes and the credibility of its resolution.").

information defendant seeks.  If the parties cannot craft an agreement, the Court

will consider the appointment of a Special Master to assist in this effort.

## V.   DELIBERATIVE PROCESS PRIVILEGE

### A.   Request and Response

The SEC has refused to produce twenty-nine responsive documents

based on assertions of the deliberative process privilege.[70]  Twenty-five are

responsive to Requests 33 through 37, which demand documents related to new

accounting standards being considered by the Emerging Issues Task Force within

the Financial Accounting Standards Board.[71]  Three relate to Request 47, which

concerned a restatement and new rebate accounting policy for General Motors.[72]

The last is responsive to Requests 40 and 42, which relate to accounting

justifications used in other enforcement actions concerning rebates.[73]  The SEC

has produced a privilege log that lists the type of document, the date, the

---

[70]    *See* 8/19/08 Revised Privilege Log, Ex. 1 to SEC Let.  One additional
document was named but not produced in response to Stockman's note in his
initial letter that the SEC had failed to identify any materials addressing a
particular request for production.  *See id.* at 2 (noting document 8A, which had not
been included in the prior privilege log).  *See also* Def. Let. at 19 n.17 (noting the
failure to identify responsive documents).

[71]    *See* Def. Let. at 19.

[72]    *See id.* at 19-20.

[73]    *See id.* at 20.

document's length, the author or authors, the addressees, and a brief statement of the subject.[74]

## B.    Applicable Law

The deliberative process privilege protects from disclosure "'documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated.'"[75] The privilege is intended "'to enhance the quality of agency decisions, by protecting open and frank discussion among those who make them within the Government.'"[76]

In order to qualify for the privilege, a document must be "predecisional" and "deliberative."[77] A document is predecisional if it was

---

[74]    *See* Revised Privilege Log.

[75]    *National Council of La Raza v. Department of Justice* ("*NCLR*"), 411 F.3d 350, 356 (2d Cir. 2005) (quoting *Tigue v. U.S. Dep't of Justice*, 312 F.3d 70, 76 (2d Cir. 2002)).

[76]    *Tigue*, 312 F.3d at 76 (quoting *Department of the Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8-9 (2001)).

[77]    *NCLR*, 411 F.3d at 356 (quoting *Grand Cent. P'ship v. Cuomo*, 166 F.3d 473, 482 (2d Cir. 1999)). The privilege also only applies when invoked by the head of an agency or a designated subordinate. *See Resolution Trust Corp. v. Diamond*, 137 F.R.D. 634, 641 (S.D.N.Y. 1991). Although the SEC failed to follow this formality initially, it corrected this error after Stockman noted it in his letter. *See* 8/27/08 Declaration of Florence E. Harmon, Acting Secretary of the SEC, Attachment 2 to SEC Let.

-31-

"'prepared in order to assist an agency decisionmaker in arriving at his

decision.'"[78] The agency claiming privilege "must be able to demonstrate that . . .

the document for which . . . privilege is claimed related to a specific decision,

facing the agency."[79]  Moreover, the privilege does not extend to "'purely factual'

material"[80] or subjective discussions insofar as they were later adopted or

incorporated in a final agency opinion.[81]  A document is deliberative if it is

"'actually . . . related to the process by which policies are formulated.'"[82] Factors

used to determine whether a document is deliberative include "whether the

document '(i) formed an essential link in a specified consultative process, (ii)

reflects the personal opinions of the writer rather than the policy of the agency,

and (iii) if released, would inaccurately reflect or prematurely disclose the views

---

[78]    *NCLR*, 411 F.3d at 356 (quoting *Grand Cent. P'ship*, 166 F.3d at 482).  Such materials include "recommendations, draft documents, proposals, suggestions, and other subjective documents [that] reflect the personal opinions of the writer rather than the policy of the agency." *Grand Cent. P'ship*, 166 F.3d at 482.

[79]    *Tigue*, 312 F.3d at 80 (citing *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 151 n.18 (1975)).

[80]    *Grand Cent. P'ship*, 166 F.3d at 482 (quoting *Hopkins v. U.S. Dep't of Housing & Urban Dev.*, 929 F.2d 81, 85 (2d Cir. 1991)).

[81]    *See NCLR*, 411 F.3d at 356 (citing *Sears*, 421 U.S. at 161).

[82]    *Id.* (quoting *Grand Cent. P'ship*, 166 F.3d at 482).

of the agency.'"[83]

## C.   Discussion

As an initial matter, the privilege log that the SEC has produced is

deficient. The listings for documents 1 through 4 are good examples. The SEC

has provided Stockman and the Court with no more useful information than the

type of document (a memorandum), the addressees (various SEC staff), and the

subject matter (Issue 00-25, a policy statement superceded by Issue 01-09, the

subject of Request 33). Given this information, the Court is unable to evaluate

whether any or all of these four memoranda are privileged, let alone understand

why the SEC produced other memoranda on the same subject. The SEC asks the

Court simply to take its word that these particular documents were predecisional,

deliberative, purely subjective, and neither adopted nor incorporated in the

agency's final decision. That cannot be sufficient.[84]

---

[83]   *Grand Cent. P'ship*, 166 F.3d at 482 (quoting *Providence J. Co. v.
U.S. Dep't of the Army*, 981 F.2d 552, 559 (1st Cir. 1992)). *Accord Tigue*, 312
F.3d at 80 (quoting *Grand Cent. P'ship*, 166 F.3d at 482) (requiring that a
privileged document "'bear on the formulation or exercise of policy-oriented
judgment'").

[84]   *See Reino De Espana v. American Bureau of Shipping*, No. 03 Civ.
3573, 2005 WL 1813017, at *13 (S.D.N.Y. Aug. 1, 2005) (requiring "precise and
certain reasons for asserting confidentiality" over documents purportedly subject
to the deliberative process privilege).

Although the SEC's letter provides additional explanation for the assertion of privilege to broad categories of documents, it should not be necessary for a party to seek court intervention in order to receive sufficient information to assess the strength of an adversary's privilege claim.[85]  Even taking into account the SEC's assertions that the documents uniformly address decisions concerning the position the SEC will take on accounting matters or investigations, the agency has not noted the extent to which the memoranda were adopted in the final agency position (and thus provide additional background or analysis analogous to legislative history).  While the deliberative process privilege protects important government interests, it still must be construed narrowly, as sustaining any privilege prevents a party from obtaining access to otherwise relevant information.  Accordingly, the SEC must submit these documents for *in camera* review, together with a short memorandum explaining why each document is entitled to protection.  A redacted version of the memorandum must be produced to Stockman.  These materials must be submitted to the Court within twenty days of receipt of this Opinion and Order.

---

[85]     With adequate information, Stockman might have accepted the SEC's privilege assertion concerning some documents and convinced the SEC to withdraw the assertion with regard to others, avoiding unnecessary motion practice.

## VI.   E-MAIL

### A.   Request and Response

The SEC's document production and its privilege log include no

e-mails or attachments to e-mail.[86]  The SEC notes that several hundred thousand

e-mails are contained within its omnibus production, but it concedes that it has not

produced e-mail "generated or received by the Commission itself."[87]  Stockman

seeks production of e-mails related to the full breadth of his requests for

production: (1) investigation and litigation concerning C&A, (2) the handling of

other cases concerning rebate accounting, and (3) the SEC's regulatory role

concerning rebates and rebate accounting.[88]

The SEC rebuts that nearly all responsive e-mails will be privileged,

protected, or non-substantive.  The SEC additionally asserts that e-mails

concerning the C&A investigation will also be subject to this Court's non-

disclosure order, which bars the SEC from disclosing the identity of witnesses

subpoenaed or interviewed and the substance of their testimony.[89]  The SEC

---

[86]   *See* Def. Let. at 24.

[87]   SEC Let. at 15.

[88]   *See* Def. Let. at 24; SEC Let. at 15.

[89]   *See* SEC Let. at 16.  This order is likely to be vacated given the
Government's decision to file a *nolle prosequi* in the parallel criminal prosecution.

concludes that Stockman has not made the "necessary showing" so as to require it

to undertake the "costly and time-consuming search that would be required to

identify responsive emails . . . ."[90]  Finally, with respect to the remaining two

categories, the SEC is critical of the lack of specificity in defendant's request,

noting – for example – that Request 43 seeks all documents relating to

"accounting for rebates" without any limitation for time period, industry, or other

criteria.[91]   Given this breadth, the SEC notes that it would be required to search

through the e-mails of hundreds of attorneys and accountants over an indefinite

period of time.

## B.    Applicable Law

It is by now well established that electronically stored information is

subject to discovery.[92]  Yet – as with all other discovery – the limitations of Rule

26(b)(2)(C) apply, as do the specific limitations of Rule 26(b)(2)(B) when a party

asserts that such information is not reasonably accessible.   It is also well

---

*See* Nolle Prosequi, *United States v. Stockman*, No. 07 Cr. 220 (S.D.N.Y. Jan. 9, 2009).

[90]     SEC Let. at 16-17.

[91]     *See id.* at 17 (quoting Stockman Requests).

[92]     *See generally* 2006 Amendments to the Federal Rules of Civil Procedure.

established that discovery is only permitted with respect to "nonprivileged matter that is relevant to any party's claim or defense."[93]  Finally, the Rules recognize the need to protect materials that would reveal the "mental impressions, conclusions, opinions, or legal theories of a party's attorney or other representative concerning the litigation."[94]

### C.    Discussion

Because e-mails are inherently searchable, the SEC's blanket refusal to produce any incoming or outgoing e-mails is unacceptable.[95]  Without even an attempt to negotiate search terms that would weed out privileged, protected, or irrelevant e-mails, the SEC cannot reasonably assert that a routine aspect of modern discovery – search and review of a party's e-mail – is beyond its capability.  Essentially, the SEC's position is that the cost of such a search is simply too high, but it has made no effort to document the cost or the likelihood that it would produce relevant, nonprivileged material.  The concept of sampling to test both the cost and the yield is now part of the mainstream approach to

---

[93]    Fed. R. Civ. P. 26(b)(1).

[94]    Fed. R. Civ. P. 26(b)(3)(B).

[95]    The SEC has acknowledged that some fraction of the e-mails "would be of substantive significance."  SEC Let. at 16.

electronic discovery.[96]  However, the SEC correctly notes that the some of the

requests may be overbroad and unduly burdensome. In considering requests for

cost-shifting with respect to expensive and burdensome discovery, this Court has

noted that the most important consideration is "[t]he extent to which the request is

specifically tailored to discover relevant information."[97]  A quick look at Request

43 – discussed above – reveals that Stockman's request is not specifically tailored

and must be revised.

Once again, the parties are directed to meet and attempt to negotiate a

reasonable search protocol (considering the use of appropriate search terms and

appropriate limitations of subject matter and date) and then to consider applying

this search protocol to a segment of the SEC's e-mail collection to determine

whether relevant nonprivileged material might be identified and produced

considering all of the factors set forth in Rule 26(b)(2)(C).

## VII.  CONCLUSION

When a government agency initiates litigation, it must be prepared to

---

[96]     *See, e.g.*, *Zubulake v. UBS Warburg LLC*, 217 F.R.D. 309, 324
(S.D.N.Y. 2003) (noting the advantage of grounding discovery disputes "in fact
rather than guesswork"); *McPeek v. Ashcroft*, 202 F.R.D. 31, 34-35 (D.D.C. 2001)
(authorizing a "test-run" of costly data restoration).

[97]     *Zubulake,* 217 F.R.D. at 322.

follow the same discovery rules that govern private parties (albeit with the benefit of additional privileges such as deliberative process and state secrets). For the reasons set forth above, the SEC is ordered to produce or identify documents organized in response to Stockman's requests; to negotiate an appropriate search protocol to locate documents responsive to requests described above in Part IV; to submit materials allegedly covered by the deliberative process privilege to the Court for *in camera* review, together with a supporting memorandum within twenty days of the date of this Order; and to negotiate an appropriately limited search protocol with respect to agency e-mail. While the SEC has raised legitimate concerns about the burdens imposed by particular requests, it cannot unilaterally determine that those burdens outweigh defendants' need for discovery. At the very least, the SEC must engage in a good faith effort to negotiate with its adversaries and craft a search protocol designed to retrieve responsive information without incurring an unduly burdensome expense disproportionate to the size and needs of the case. The parties are therefore directed to engage in a cooperative effort to resolve the scope and design of a search with respect to the rebate issues and a search of e-mail created and maintained by the SEC. A conference is scheduled for February 13, at 5:00 pm, by which date the parties should have completed the meet and confer process in

-39-

the hope of establishing an acceptable discovery program. If the parties remain at

an impasse, the Court will be prepared to resolve further disputes and will

consider the appointment of a Special Master to supervise the remaining discovery

in this case.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:      New York, New York
            January 13, 2009

## -Appearances-

**Counsel for the SEC:**

H. Michael Semler, Esq.
Christopher R. Conte, Esq.
J. David Fielder, Esq.
Mark Kreitman, Esq.
John David Worland, Jr., Esq.
Securities and Exchange Commission
100 F Street, NE
Washington, DC 20549
(202) 551-4429

Robert B. Blackburn, Esq.
Securities and Exchange Commission
3 World Financial Center, Room 437
New York, New York 10281
(212) 336-1050

**Counsel for Defendant David A. Stockman:**

Andrew Bennett Weissman, Esq.
Joseph Keith Brenner, Esq.
William R. McLucas, Esq.
Howard M. Shapiro, Esq.
Jesse Taylor Travis, Esq.
WilmerHale
399 Park Avenue
New York, NY 10022
(202) 663-6612

**Counsel for Defendant J. Michael Stepp:**

Gandolfo Vincent DiBlasi, Esq.
David Edward Swarts, Esq.
Stacey Rubin Friedman, Esq.
Sullivan and Cromwell, LLP
125 Broad Street
New York, New York 10004
(212) 558-3836

**Counsel for Defendant David R. Cosgrove**

Ken Laves Hashimoto, Esq.
Arnold & Porter, LLP
399 Park Avenue
New York , New York 10022
(212) 715-1077

**Counsel for Defendant Elkin B. McCallum**

Jeffrey A. Simes, Esq.
Richard Mark Strassberg, Esq.
Laurie L. Levin, Esq.
Goodwin Procter, LLP
The New York Times Building
620 Eighth Avenue
New York , New York 10018
(212) 813-8879

**Counsel for Defendant Paul C. Barnaba**

Carl Spencer Kravitz, Esq.
Lenora Miles Rigby, Esq.
Zuckerman Spaeder, LLP
1800 M Street, NW, Suite 1000
Washington, DC 20036
(202) 778-1873

Laura Elizabeth Neish, Esq.
Zuckerman Spaeder, LLP
1540 Broadway, Suite 1604
New York, New York 10036
(212) 704-9600

Adrienne Urrutia Wisenberg, Esq.
Solomon Louis Wisenberg, Esq.
Wisenberg & Wisenberg, PLLC
1711 N Street, NW, 2nd Floor
Washington, DC 20036
(202) 261-3649

**Counsel for Defendant John G. Galante**

Michael Shapiro, Esq.
Carter Ledyard & Milburn, LLP
2 Wall Street
New York , NY 10005
(212) 732-3200

**Counsel for Defendant Christopher M. Williams**

James Alfred Mitchell, Esq.
Stillman, Friedman & Shechtman, P.C.
425 Park Avenue
New York , NY 10022
(212) 223-0200

**Counsel for Intervener U.S. Department of Justice:**

Anthony Scott Barkow
Marc Peter Berger
Helen Virginia Cantwell
Guruanjan Sahni
Assistant United States Attorneys
Southern District of New York
86 Chambers Street
New York, NY 10007
212-637-2200